UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOWNTOWN MUSIC PUBLISHING LLC,
OLE MEDIA MANAGEMENT, L.P., BIG
DEAL MUSIC, LLC, CYPMP, LLC, PEER
INTERNATIONAL CORPORATION, PSO
LIMITED, PEERMUSIC LTD., PEERMUSIC
III, LTD., PEERTUNES, LTD., SONGS OF
PEER LTD., RESERVOIR MEDIA
MANAGEMENT, INC., THE RICHMOND
ORGANIZATION, INC., ROUND HILL
MUSIC LLC, THE ROYALTY NETWORK,
INC., and ULTRA INTERNATIONAL
MUSIC PUBLISHING, LLC,

      Plaintiffs and Counterclaim
      Defendants, and

GREENSLEEVES PUBLISHING LIMITED,
ME GUSTA MUSIC, LLC, RALEIGH
MUSIC PUBLISHING LLC, STB MUSIC,
INC., and TUNECORE, INC.,

      Plaintiffs, and

NATIONAL MUSIC PUBLISHERS'
ASSOCIATION, INC.,

      Counterclaim Defendant,

      v.

PELOTON INTERACTIVE, INC.,

      Defendant and Counterclaim
      Plaintiff.

No. 19-cv-02426 (DLC)

**ORAL ARGUMENT REQUESTED**

**COUNTERCLAIM DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS
DEFENDANT-COUNTERCLAIM PLAINTIFF'S COUNTERCLAIMS**

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Counterclaim Defendants*

Dated: June 24, 2019

# **TABLE OF CONTENTS**

Page

Table of Authorities ........................................................................................................ ii

Preliminary Statement ......................................................................................................1

Statement of Facts.............................................................................................................2

    A.    Procedural History ...............................................................................2

    B.    The Allegations of the Counterclaims .................................................3

        1.    Peloton's Business .....................................................................3

        2.    Peloton's Allegations of Anticompetitive and Tortious Conduct by Counterclaim-Defendants ..........................................................3

Argument ..........................................................................................................................6

I. PELOTON FAILS TO ALLEGE AN ANTITRUST CLAIM FOR HORIZONTAL COLLUSION ...................................................................................7

    A.    COUNTERCLAIM-DEFENDANTS' JOINT CONDUCT IN FILING A COPYRIGHT INFRINGEMENT LAWSUIT IS IMMUNE FROM ANTITRUST SCRUTINY UNDER THE *NOERR-PENNINGTON* DOCTRINE ..............................................................................................7

    B.    PELOTON FAILS ADEQUATELY TO ALLEGE ANY CONSPIRATORIAL CONDUCT BY COUNTERCLAIM-DEFENDANTS OUTSIDE THE SCOPE OF THE COPYRIGHT LITIGATION ......................................................................................10

        1.    Peloton Does Not Adequately Allege a Direct Case of Conspiracy..........11

        2.    Peloton Does Not Adequately Allege Facts Circumstantially Demonstrating A Conspiracy ....................................................11

    C.    PELOTON FAILS TO ALLEGE A RELEVANT PRODUCT MARKET ...........................................................................................16

II. PELOTON FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS .............................................18

    A.    PELOTON FAILS TO CLEAR THE "PARTICULARLY HIGH HURDLE" OF STATING A CLAIM THAT NMPA'S CONDUCT CONSTITUTED A CRIME, AN INDEPENDENT TORT, OR AN ACT THE *SOLE* PURPOSE OF WHICH WAS INTENTIONALLY TO HARM PELOTON ..................................................................................19

    B.    PELOTON FAILS TO ALLEGE THAT IT WOULD HAVE ENTERED INTO SYNCHRONIZATION LICENSES WITH MUSIC PUBLISHERS "BUT FOR" THE NMPA'S CONDUCT ...............................23

Conclusion ......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*10 Ellicott Square Court Corp.* v. *Violet Realty, Inc.*,
   81 A.D.3d 1366, 1367 (N.Y. App. Div. 4th Dep't 2011) ...........................................22

*16 Casa Duse, LLC* v. *Merkin*,
   791 F.3d 247 (2d Cir. 2015) ...............................................................................19, 22

*Ace Arts, LLC* v. *Sony/ATV Music Pub., LLC*,
   56 F. Supp. 3d 436 (S.D.N.Y. 2014) .........................................................................18

*AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*,
   181 F.3d 216 (2d Cir. 1999) .....................................................................................11

*United States* v. *Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .....................................................................................14

*Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*,
   356 F. Supp. 3d 379 (S.D.N.Y. 2019) .......................................................................24

*Arista Records LLC* v. *Lime Group LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007) .................................................................13, 16

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2007)...............................................................................................3, 6

*Atl. Richfield Co.* v. *12 USA Petroleum Co.*,
   495 U.S. 328 (1990)..................................................................................................16

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .........................................................................................6

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544 (2007)..........................................................................................passim

*Broadcast Music, Inc.* v. *Columbia Broadcasting System., Inc.*,
   441 U.S. 1 (1979)......................................................................................................16

*Carvel Corp.* v. *Noonan*,
   3 N.Y.3d 182 (N.Y. 2004) ..................................................................................20, 23

*Chapman* v. *New York State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) .....................................................................................16

*Clorox Co.* v. *Sterling Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997) .......................................................................................16

*Columbia Pictures Industries, Inc.* v. *Professional Real Estate Investors, Inc.*
  944 F.2d 1525 (9th Cir. 1991) ..................................................................8, 13

*Confido Advisors, LLC* v. *USAA Real Estate Co.*,
  No. 17 Civ. 5632 (JFK), 2018 WL 4265900 (S.D.N.Y. Sept. 6, 2018) ...............19, 21

*Friedman* v. *Coldwater Creek, Inc.*,
  551 F. Supp. 2d 164 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009) ..................................................................................................20, 22

*Graham* v. *Barriger*,
  699 F. Supp. 2d 612, 623 (S.D.N.Y. 2009) .....................................................4

*Henneberry* v. *Sumitomo Corp. of Am.*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006) ...........................................................18

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) ............................................................15

*Interscope Records* v. *Time Warner, Inc.*,
  CV 10–1662 SVW, 2010 WL 11505708 (C.D. Cal. June 28, 2010)..........................9

*Kahn* v. *Salomon Bros., Inc.*,
  813 F. Supp. 191 (E.D.N.Y. 1993) ............................................................20, 22

*Kramer* v. *Pollock-Krasner Found.*,
  890 F. Supp. 250 (S.D.N.Y. 1995) ...............................................................19

*Kramer* v. *Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991) ........................................................................4

*Leegin Creative Leather Prods.* v. *PSKS, Inc.*,
  551 U.S. 877 (2007)..................................................................................16

*Lions Gate Entm't Corp.* v. *Icahn*,
  No. 10 CV 08169(HB), 2011 WL 1217245 (S.D.N.Y. Mar. 30, 2011) .....................21

*Maverick Recording Co.* v. *Chowdhury*,
  2008 WL 3884350 (E.D.N.Y. Aug. 19, 2008) ...................................................9

*Mayor and City of Baltimore, Md.* v. *Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ...............................................................10, 11, 12

*Meredith Corp.* v. *SESAC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) ...............................................................17

*Mooney* v. *AXA Advisers, L.L.C.*,
    19 F. Supp. 3d 486 (S.D.N.Y. 2014) ....................................................16

*Moore* v. *Boating Indus. Assn's*,
    819 F.2d 693 (7th Cir. 1987) ...........................................................14

*In re Musical Instruments and Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...........................................................11

*Ortiz* v. *Todres & Co., LLP*,
    No. 15 Civ. 1506 (LGS), 2019 WL 1207856 (S.D.N.Y. Mar. 14, 2019) ...................24

*Pearson Educ. Inc.* v. *Allen Air Conditioning Co.*,
    No. 08 Civ. 6152 (KBF), 2014 WL 2154099 (S.D.N.Y. May 22, 2014) ...................7

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...........................................................17

*Primetime 24 Jt. Venture* v. *Natl. Broad. Co., Inc.*,
    219 F.3d 92, 100 (2d Cir. 2000) .............................................8, 9, 10, 13

*Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*,
    508 U.S. 49 (1993)..................................................................7, 8

*Riddell Sports Inc.* v. *Brooks*,
    872 F. Supp. 73 (S.D.N.Y. 1995) .....................................................24, 25

*Rockland Exposition, Inc.* v. *All. of Auto. Serv. Providers of N.J.*
    894 F. Supp. 2d 288,  334 (S.D.N.Y. 2012) .............................................22

*Ross* v. *Am. Express. Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014) ...................................................15

*Solmetex, LLC* v. *Dental Recycling of N. Am., Inc.*,
    No. 17-cv-860 (JSR), 2017 WL 2840282 (S.D.N.Y. June 26, 2017)..................20–22

*Sosa* v. *DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...........................................................8, 9

*Starr* v. *Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ...........................................................10

*United States* v. *Taubman*,
    297 F.3d 161 (2d Cir. 2002) ...........................................................15

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ...........................................................14

*Weiss/Watson, Inc.* v. *Lange*,
    No. 87 CIV 0032 (JFK), 1990 WL 33601 (S.D.N.Y. March 21, 1990) .....................24

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) .........................................................................11

**STATUTES**

15 U.S.C. § 1..............................................................................................................2, 10, 16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ...............................................................................................6, 25

THOMAS V. VAKERICS, ANTITRUST BASICS § 6.10 (2019) ...............................................15

## PRELIMINARY STATEMENT

For years, Defendant-Counterclaim Plaintiff Peloton Interactive, Inc. ("Peloton") has used copyrighted musical works owned and/or controlled by Plaintiffs without their consent, and without obtaining the necessary synchronization (or "sync") licenses, as part of a strategy to build a music-centric brand that is now reportedly worth in excess of $4 billion.  Having no defense to its copyright infringement, Peloton resorts to the timeworn tactic of asserting a baseless antitrust counterclaim against Plaintiffs, who are independent music publishers (the "Publishers"), and the Publishers' trade association, National Music Publishers' Association, Inc. ("NMPA"), as well as charging NMPA with tortiously interfering with Peloton's prospective business relations.  Peloton's counterclaims fail to state a claim under either antitrust or common law and should be dismissed in their entirety with prejudice.

Peloton fails to allege an antitrust claim for horizontal collusion.  It is settled law that the very conduct identified as the basis for Peloton's claim—the Publishers' filing of the copyright infringement lawsuit and any alleged joint refusal to license incidental to that lawsuit—is shielded from antitrust liability by the *Noerr-Pennington* doctrine.  Any other conclusion would render *Noerr-Pennington* meaningless.

To avoid dismissal of its Sherman Act claim under *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), Peloton must allege facts that adequately show either directly or circumstantially that NMPA and the "Coordinating Publishers" engaged in concerted action that is not otherwise protected by *Noerr-Pennington*.  Peloton has not done so here.  Peloton pleads no direct evidence of coordination between the Publishers and NMPA, other than lawful conduct incidental to the filing of this suit.  And its circumstantial facts fail to exclude the possibility that the Publishers' decisions not to

license Peloton were the result of either (a) activity protected under *Noerr-Pennington* or (b) independent determinations rather than collusion. These pleading failures are fatal under *Twombly.*

Peloton's antitrust counterclaim should also be dismissed because it has failed to allege a proper relevant product market in which it is suffering anticompetitive effects. Peloton asserts that the relevant product market consists only of the works of those publishers who are party to this suit. That is plainly improper as a matter of well-established law, which requires the market to be composed of all reasonably substitutable musical compositions (including compositions controlled by music publishers with which Peloton *does* have sync licenses).

Peloton's claim against NMPA for tortious interference with prospective business relations similarly fails as a matter of law. Peloton fails to clear the "particularly high hurdle" of alleging that NMPA's conduct constituted a crime, an independent tort, or an act the *sole* purpose of which was intentionally to harm Peloton. Nor does Peloton allege adequately that it would have entered into sync licenses with music publishers "but for" NMPA's conduct. Those pleading failures require dismissal of Peloton's tortious interference claim.

## STATEMENT OF FACTS

### A. Procedural History

The Publishers filed the Complaint in this action ("Compl.") on March 19, 2019, alleging that Peloton is liable for willful infringement of the copyrights in over 1,000 musical compositions owned or controlled by the Publishers. (*See* Compl. ¶¶ 1–6.) Peloton answered the Complaint on April 30, 2019, asserting two Counterclaims against the

Publishers and Counterclaim Defendant NMPA:  alleged violation of § 1 of the Sherman Act and alleged tortious interference with prospective business relations.  (Counterclaims ¶¶ 91–108.)  On May 31, 2019, the Publishers filed an Amended Complaint (the "First Amended Complaint" or "FAC") that added five additional publisher plaintiffs to the action, as well as additional musical compositions willfully infringed by Peloton.  (FAC ¶¶ 1–23; Ex. A.)  Peloton filed its answer to the FAC on June 14, 2019.

## B.     The Allegations of the Counterclaims[1]

### 1.     Peloton's Business

Peloton "simulates the experience of an in-studio group cycling class" by offering products that allow consumers to "stream in real-time" instructor-led fitness classes.  (Counterclaims ¶ 5.)  These classes "are also recorded and archived in Peloton's on-demand library (now consisting of thousands of classes) for later consumption."  (*Id.*) "Instructors choose music to play during their classes, curating playlists of songs that are suitable for the feel and tempo desired by the instructor."  (*Id.* ¶ 6.)  Peloton alleges that it "does not need licenses to all or even most music."  (*Id.* ¶ 35.)

### 2.     Peloton's Allegations of Anticompetitive and Tortious Conduct by Counterclaim-Defendants

In April 2018, NMPA issued a cease-and-desist letter to Peloton, noting "that Peloton has infringed, and remains unauthorized to use, music owned and/or controlled by NMPA's independent publisher members" and expressing its "willing[ness] to engage in a dialogue concerning a negotiated resolution" of the infringement, which would include "fair compensation for all past, present, and future uses by Peloton of works

---

[1]   Counterclaim-Defendants assume, as they must, the truth of the allegations of the Counterclaims only for the purpose of this motion to dismiss.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 696 (2007).

that [were] presently unlicensed." (*See* Beale Declaration, Exhibit 1 (Apr. 9, 2018 Letter from J. Cohen to H. Kushi).)[2]  Peloton alleges that NMPA threatened to "turn many in the music publishing industry against" it, unless Peloton agreed to enter into negotiations with NMPA to "license, on a going-forward basis, the use of compositions controlled by NMPA members which had not yet entered into agreements with Peloton." (Counterclaims ¶¶ 33–34.)   Peloton does not assert that it attempted to negotiate sync licenses with any of the Publishers before receiving the NMPA letter.

Peloton alleges that, although negotiations were originally fruitful, ultimately, "NMPA deliberately obfuscated to member publishers the substance of its discussions with Peloton" and "told its members that Peloton had withdrawn from the negotiations and was unwilling to further engage." (*Id.* ¶¶ 38–40.)  Peloton alleges that it began to negotiate directly with certain of the Publishers in January of 2019.[3]   Although Peloton does not plead that the negotiations progressed beyond Peloton's furnishing of a term sheet and non-disclosure agreement ("NDA"), it nonetheless asserts that it had a "reasonable expectancy" of licensing relationships with music publishers generally. (*Id.* ¶ 101.)  According to Peloton, in mid-February 2019, the Publishers "suddenly cut off negotiations." (*Id.* ¶ 59; *see also* ¶¶ 46, 52, 57.)  One month later, the Publishers filed the Complaint. (*See id.* ¶¶ 49, 55.)

---

[2]    The April 9, 2018 correspondence is referenced in the Counterclaims (¶ 33), and thus this Court may consider it in connection with this motion. *See Graham* v. *Barriger*, 699 F. Supp. 2d 612, 623 (S.D.N.Y. 2009) ("[A] court may consider documents annexed to the complaint or incorporated in the complaint by reference without converting the motion to dismiss into a motion for summary judgment.") (citations omitted); *see also Kramer* v. *Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[3]    Those include ole Media Management L.P. ("ole"), Reservoir Media Management, Inc. ("Reservoir"), Big Deal Music, LLC ("Big Deal"), CYPMP, LLC ("Pulse"), Round Hill Music LLC ("Round Hill"), and the Peer group of publishers ("Peer"). (*Id.* ¶ 42.)  Additionally, Peloton asserts that it began negotiations with Publisher Downtown Music Publishing LLC ("Downtown") at some point in 2018, concurrent with its negotiations with NMPA, but that these negotiations failed to result in an agreement. (*See id.* ¶ 56.)

Peloton alleges that with NMPA as the "ringleader," the Publishers conspired to "fix prices and to engage in a concerted refusal to deal." (*Id.* ¶ 3.) Rather than allege where, when, and how this collusion took place, Peloton asserts that the Publishers had "many opportunities to meet and exchange such information" at industry events as well as at "backroom" meetings hosted by NMPA. (*Id.* ¶¶ 64–67.) Peloton does not assert which of the Publishers (if any) attended any such industry events, let alone that any "exchange of information" among them actually occurred there. Likewise, Peloton does not allege where or when any "backroom" meetings took place, who was in attendance, or what was purportedly discussed. This collusion, Peloton alleges, allowed the Publishers to "seek to enjoy supracompetitive prices," (*Id.* ¶ 77), in the market for "reproduction rights licenses to the copyrighted works controlled (in whole or in part) and collectively negotiated by the Coordinating Publishers through NMPA." (*Id.* ¶ 68.)

*Second*, Peloton claims that NMPA interfered with Peloton's ongoing discussions with publishers who "were prepared to negotiate and issue licenses to Peloton up until the time of NMPA's ringleading efforts." (*Id.* ¶ 102.) Peloton does not provide any facts in support of its naked allegation that publishers were "prepared to issue licenses" but for NMPA's purported interference. (*Id.* ¶ 102.)

Peloton claims that NMPA effectuated this scheme "through its provision of information (and misinformation)" to the Publishers, including by allegedly sharing information protected by an NDA with Peloton. (*Id.* ¶ 104.) It does not specify what NDA-protected information or materials NMPA allegedly revealed to the "Coordinating Publishers," or how this information was used "to interfere with individual publishers' ensuing negotiations with Peloton . . . and to orchestrate the commencement of this

lawsuit." (*Id.* ¶ 41.)  Further, Peloton offers no facts to illuminate its conclusory statement that NMPA exerted "significant pressure" on the Publishers to prevent them from negotiating with Peloton directly, or the identities of the unnamed "other publishers" NMPA allegedly coerced.  (*Id.* ¶¶ 58–61.)  To the contrary, Peloton concedes that it was "able to reach agreements with certain music publishers who had initially been a part of the group NMPA had purportedly represented in the collective negotiations."  (*Id.* ¶ 61.) Peloton makes no allegation as to why, other than to advance the economic interests of music publishers, NMPA would have attempted to negotiate with Peloton on behalf of the Publishers.  (*See id.* ¶¶ 61, 77, 81, 88.)

## ARGUMENT

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Although reasonable inferences may be drawn in plaintiff's favor, the Supreme Court has emphasized that mere conclusory statements and "formulaic recitation of the elements of a cause of action" are not sufficient.  *Twombly*, 550 U.S. at 555.  Dismissal is appropriate where a plaintiff fails to "'raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

**I.**

**PELOTON FAILS TO ALLEGE AN
ANTITRUST CLAIM FOR HORIZONTAL COLLUSION**

**A.    COUNTERCLAIM-DEFENDANTS' JOINT CONDUCT
IN FILING A COPYRIGHT INFRINGEMENT LAWSUIT
IS IMMUNE FROM ANTITRUST SCRUTINY UNDER
THE *NOERR-PENNINGTON* DOCTRINE**

The decision by the Publishers to file a copyright infringement action against Peloton for using their music without the required sync licenses, as well as the discussions between those Publishers and NMPA leading up to that decision, are shielded from antitrust liability under the *Noerr-Pennington* doctrine.  *See Pearson Educ. Inc.* v. *Allen Air Conditioning Co.*, No. 08 Civ. 6152 (KBF), 2014 WL 2154099, at *9 (S.D.N.Y. May 22, 2014) (granting motion to dismiss and holding that book publishers' coordinated litigation against alleged copyright infringers was immunized under *Noerr-Pennington*).

Peloton's only path around *Noerr-Pennington* would require it to allege that (1) "the lawsuit [was] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) the "baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U.S. 49, 50 (1993) (citing *E. R. R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).  Peloton makes no such allegations here—nor can it.  It does not and cannot allege that the Publishers' copyright claims—arising from the failure to obtain sync licenses—are baseless.  Nor are the Publishers competitors of Peloton.

*Noerr-Pennington* immunity applies not only to the actual filing of the lawsuit, but also to conduct incidental to the filing of a lawsuit.  *Primetime 24 Jt. Venture* v. *Natl. Broad. Co., Inc.*, 219 F.3d 92, 100 (2d Cir. 2000).  *Columbia Pictures Industries, Inc.* v. *Professional Real Estate Investors, Inc.* ("*PREI*") is directly on point here.  944 F.2d 1525 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993).  There, eight movie studios filed a copyright infringement litigation against a resort hotel based on the hotel's rental to its guests of videodiscs containing copyrighted films.  Like Peloton, PREI then filed an antitrust counterclaim, accusing the movie studios of, among other things, a "concerted refusal to deal" in refusing to grant a license to the resort.  *Id.* at 1528–29.  In an opinion subsequently affirmed by the Supreme Court, the Ninth Circuit concluded that the movie studios' joint refusal to license was "conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability."  *Id.* at 1528.

*PREI* involved claims of coordinated refusals to license after the filing of the copyright infringement lawsuit, but *Noerr-Pennington* protection does not turn on that fact.  The actions of the Publishers and NMPA to redress Peloton's infringement prior to the filing of the lawsuit are likewise protected under *PREI*.  *Noerr-Pennington* immunity indisputably applies to prelitigation conduct incidental to subsequent litigation.  *Primetime 24*, 219 F.3d at 100 (discussing examples such as prelitigation threat letters, concerted threats of litigation, prelitigation assertion of trademark rights, and settlement offers as included in the *PREI* protections).  In *Sosa* v. *DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), the Ninth Circuit rejected an antitrust plaintiff's effort to limit the scope of its holding in *PREI* to post-suit behavior, holding that parties asserting claims need to have "breathing

space" to coordinate their conduct even prior to filing a lawsuit. *Id.* at 934–39. Peloton's allegation that the Publishers participated in "backroom" meetings organized by NMPA to "further[] their collusion" and presumably prepare for the filing of this case (*see* Counterclaims ¶ 67) is the precise sort of conduct that parties are entitled to undertake as they consider whether, and prepare, to file suit to enforce their rights. *See Sosa*, 437 F.3d at 936–37. Any other conclusion would eviscerate *Noerr-Pennington.*

Under the *Noerr-Pennington* doctrine, courts have consistently refused to permit antitrust claims predicated on the collective enforcement of copyrights. *Maverick Recording Co.* v. *Chowdhury*, 2008 WL 3884350 (E.D.N.Y. Aug. 19, 2008), is illustrative. There, plaintiffs—a group of record companies organized by the Recording Industry Association of America ("RIAA")—brought copyright infringement actions against two individuals for distributing protected sound recordings over the Internet. *Id.* at *1. The defendants counterclaimed, alleging antitrust violations and copyright misuse, based on the plaintiffs' use of collective litigation techniques spearheaded by the RIAA. *Id.* at *3. The court rejected both counterclaims, holding that "even if collectively bringing infringement suits could be considered anticompetitive-which it cannot, the *Noerr-Pennington* doctrine would immunize plaintiffs' conduct from antitrust liability. . . . Under the *Noerr-Pennington* doctrine, the plaintiffs have the right to join together to prosecute their claims of copyright infringement, even if such conduct could be considered anticompetitive, as long as the litigation is not a 'sham.'" *Id.* (internal citations omitted); *see also Interscope Records* v. *Time Warner, Inc.*, CV 10–1662 SVW, 2010 WL 11505708, at *10 (C.D. Cal. June 28, 2010) ("Moreover, 'coordinated efforts to enforce copyrights against a common

infringer,' without more, do not give rise to an antitrust violation or a misuse defense.")
(quoting *Primetime 24*, 219 F.3d at 99).  The same conclusion is compelled here.

**B.     PELOTON FAILS ADEQUATELY TO ALLEGE
          ANY CONSPIRATORIAL CONDUCT BY
          COUNTERCLAIM-DEFENDANTS OUTSIDE
          THE SCOPE OF THE COPYRIGHT LITIGATION**

Apart from the allegations regarding conduct protected by the *Noerr-Pennington* doctrine, Peloton's antitrust counterclaim fails to allege any actionable concerted conduct among NMPA and the "Coordinating Publishers."  To state a conspiracy claim, the burden is on Peloton to plead facts plausibly demonstrating that the Publishers' decision to forgo or discontinue licensing negotiations must have been the product of a horizontal agreement among the Publishers to boycott Peloton outside the scope of a joint effort to enforce their copyrights.  Peloton has fallen far short of that burden.

Section 1 of the Sherman Act prohibits agreements that anticompetitively restrain trade, and the burden is on the party alleging a violation of Section 1 to adequately allege that such an agreement exists.  *Twombly*, 550 U.S. at 556.  "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stems from an independent decision or from an agreement, tacit or express."  *Starr* v. *Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted).  "A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  *Mayor and City of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  The Counterclaims contain no such facts.

## 1.      Peloton Does Not Adequately Allege a Direct Case of Conspiracy

Peloton does not even attempt to allege a direct case of conspiracy.  (*See generally* Counterclaims.)   Its complaint fails to plead the required "evidentiary facts: who, did what, to whom (or with whom), where, and when." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (internal quotation marks omitted); *see also Mayor and City*, 709 F.3d at 136 (giving example of recorded phone call as the type of direct evidence that might satisfy the plaintiff's burden of pleading direct evidence).  Rather, Peloton relies on vague allegations that the Publishers, "as instigated by and through NMPA, have engaged in collective negotiations of license terms and have exchanged information with each other about ongoing license negotiations" at unidentified times and places.  (*See* Counterclaims ¶¶ 65–67.)  Such allegations fall far short of pleading an agreement that can withstand dismissal.[4]  *See Twombly*, 550 U.S. at 548–49, 557, 565 n.10 (holding that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" where the allegations "mention[] no specific time, place, or person involved in the alleged conspiracies.").

## 2.      Peloton Does Not Adequately Allege Facts Circumstantially Demonstrating A Conspiracy

Alternatively, the plaintiff may "present circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor and City*, 709 F.3d at 136.  However, parallel

---

[4]      Peloton has not even tried to adequately plead participation in the alleged conspiracy by any particular individual Publisher, not to mention each and every one of them.  Instead, Peloton attempts to lump them together under vague titles such as "Other Publishers," (Counterclaims ¶¶ 58–61), or the "Coordinating Publishers." (*Id.* ¶ 3.)  But the fact that the Publishers are each NMPA members does not relieve Peloton of its burden to plead facts permitting an inference of conspiracy with respect to *each and every individual Publisher*.  *See AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) ("[A]n antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("*Twombly* makes clear that at the pleading stage . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.").

conduct by the defendants—here, for example, that some of the Publishers ceased negotiations over licensing agreements at about the same time—is insufficient, even at the pleading stage, because parallel conduct is often just as consistent with independent action as collusion.  *Id.* at 136–37.  To survive a motion to dismiss, the complaint must allege factors (often called "plus factors") tending to disprove the inference that the parallel conduct was the product of independent decision-making.  *Mayor and City*, 709 F.3d at 136–38.

Peloton fails to allege facts tending to demonstrate that the discontinuation of licensing discussions with the Publishers resulted from a (non-privileged) collusive agreement.  Stripped of the legal conclusions, which have no bearing on the sufficiency of Peloton's pleading, the facts Peloton alleges are these:  NMPA sent an April 9, 2018 cease-and-desist letter offering to negotiate a licensing arrangement on behalf of "an untold number of its member companies," which led to negotiations that ended in January 2019.  (Counterclaims ¶ 33.)  Thereafter, Peloton tried to negotiate directly with some, but not all, of the "Coordinating Publishers."  Peloton only alleges direct negotiations with three of the Publishers (Downtown, ole, and Reservoir) and vaguely asserts with no additional support that it "reached out" to Big Deal, Pulse, Round Hill, Peer, and unnamed "Other Publishers."  (*Id.* ¶¶ 42–61.)  These so-called "Coordinating Publishers" then "ceased communications with Peloton" just before the copyright lawsuit was filed.  (Counterclaims ¶ 42.)

These allegations are clearly insufficient to raise an inference that the Publishers colluded to deny Peloton licensing opportunities.  Peloton's own allegations offer unactionable alternative explanations for the common pattern of failure to engage or negotiations continuations by the Publishers.

The timing of the alleged discontinuation of the negotiations—shortly before or at the time the copyright lawsuit was filed—presents an obvious explanation. (*See* Counterclaims ¶¶ 38–39, 42–59, 61.)  Each of the Publishers that reached a decision to sue Peloton for copyright infringement, which would be protected under the *Noerr-Pennington* doctrine, would have an obvious reason to discontinue further negotiations with Peloton, even without any sort of horizontal agreement to do so (which, in any event, would be protected under the *Noerr-Pennington* doctrine as incidental to the filing of the copyright infringement lawsuit).  *See, e.g.*, *Primetime 24*, 219 F.3d at 100; *PREI*, 944 F.2d at 1528; *see also Twombly*, 550 U.S. at 556–57; *Arista Records LLC* v. *Lime Group LLC*, 532 F. Supp. 2d 556, 578 (S.D.N.Y. 2007) (holding allegations that record companies had each refused to license to a company "notorious . . . for massive copyright infringement" insufficient to state an antitrust claim).

Peloton's own allegations provide further reasons that no inference can be drawn that the Publishers collectively agreed to stop negotiating for licenses with Peloton. Peloton alleges that "NMPA instigated this collective refusal to deal by, among other means, misrepresenting the status of Peloton's engagement and negotiations with NMPA and providing and using information (and misinformation) in violation of the NDA it had signed with Peloton."  (Counterclaims ¶ 60.)  This allegation undermines any inference that the "Coordinating Publishers" would only have cut off individual negotiations if they agreed with each other to do so.  They could each have done so based on a similar understanding (or misunderstanding) about the status of NMPA/Peloton negotiations; for example, an expectation that NMPA would secure a favorable license arrangement through its negotiations or that such an arrangement was unlikely and therefore copyright litigation

against Peloton would be preferable.[5]   Similarly, Peloton's unsupported allegation that NMPA "deliberately obfuscated to member publishers the substance of its discussions with Peloton," including telling "its members that Peloton had withdrawn from the negotiations and was unwilling to further engage" undermines Peloton's effort to establish coordinated conduct.   (Counterclaims ¶ 40.)   This allegation provides another explanation, independent of collusion, for why the Publishers stopped negotiating—if they had all been told that Peloton was unwilling to engage in further negotiation, they would naturally not have continued to pursue fruitless negotiations, even without any coordination.[6]

Beyond the allegation that the "Coordinating Publishers" all cut off negotiations at the same time, Peloton has alleged no facts circumstantially raising an inference of collusion.   It focuses on the "Coordinating Publishers'" participation in the same trade association, (Counterclaims ¶¶ 62–67), but mere participation in trade associations and industry events is not, by itself, evidence of collusion.   *In re Travel Agent Comm'n Antitrust Litig.,* 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."); *Moore* v. *Boating Indus. Assn's*, 819 F.2d 693, 712 (7th Cir. 1987)

---

[5]   Whether or not NMPA misrepresented the status of the negotiations or violated the NDA is inapposite here and has no bearing on the antitrust question:   whether there was a horizontal agreement among the Publishers to unlawfully cut off negotiations with Peloton.

[6]   It is well-established that "a finding of conspiracy requires evidence that tends to exclude the possibility that the defendant was acting independently," even if a "hub-and-spoke" conspiracy that combines a horizontal agreement between competitors with an agreement with a coordinating "hub" at another level of the market can constitute a *per se* antitrust violation.   *See United States* v. *Apple, Inc.*, 791 F.3d 290, 315, 323–24 (2d Cir. 2015) (internal quotation marks omitted), *aff'g United States* v. *Apple Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013) (Cote, J).   Indeed, in *Apple*, the court affirmed this Court's finding of an antitrust violation by the "hub" of the alleged conspiracy only after noting the "overwhelming" evidence of both horizontal and vertical collusion.   *Id.* at 319–20.

14

("[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws.") (quoting THOMAS V. VAKERICS, ANTITRUST BASICS § 6.10 (2019)); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 483 (S.D.N.Y. 2017) (dismissing antitrust claims on grounds that allegations that defendant occupied posts in trade associations were insufficient to show conspiracy).  Conspiracy cannot be inferred merely from the fact that people in the same business meet together.  *See United States* v. *Taubman*, 297 F.3d 161, 166 (2d Cir. 2002).  Nor does the allegation that the head of NMPA exhorted members to "work together to 'expand the pie,'" (Counterclaims ¶ 64), remotely establish anticompetitive collusion.  *Ross* v. *Am. Express. Co.*, 35 F. Supp. 3d 407, 442–43 (S.D.N.Y. 2014) (banks' incentive to work together to achieve common industry goals did not create an inference of collusion).

Peloton's assertion that "it is against the economic self-interest of the Coordinating Publishers to refuse to offer to prospective licensees access to their musical works other than through an NMPA-negotiated collective license," (Counterclaims ¶ 75), on the other hand, is a legal conclusion without substance.  If each of the Publishers anticipated joining a copyright infringement lawsuit against Peloton, it would be entirely in each Publisher's individual self-interest to await the outcome of the copyright infringement case before committing to licensing terms, as success in the copyright case would obviously enhance the Publisher's bargaining position. Nor is it against the economic self-interest of the Publishers to refuse to license Peloton on terms that did not fairly reflect the value of their musical works.

15

## C.   PELOTON FAILS TO ALLEGE A RELEVANT PRODUCT MARKET

Even assuming Peloton had alleged an agreement among the "Coordinating Publishers" and NMPA—and it has not—that would not suffice to meet Peloton's pleading burden under Section 1 of the Sherman Act, because Peloton has not adequately alleged a relevant product market.

To state a Section 1 claim under the applicable "rule of reason" analysis, Peloton bears the burden of alleging facts showing anticompetitive effects in a properly defined relevant market. *Clorox Co.* v. *Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997); *see also Mooney* v. *AXA Advisers, L.L.C.*, 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014).[7] A relevant market must be defined with reference to the reasonable substitutability of products or services:  "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman*

---

[7]   The Counterclaims do not allege that the purported agreement between the "Coordinating Publishers" and NMPA constitutes the type of naked restraint that is *per se* illegal, and the Counterclaims are appropriately assessed under the rule of reason. *See, e.g.*, *Atl. Richfield Co.* v. *12 USA Petroleum Co.*, 495 U.S. 328, 342 (1990) (In antitrust cases, "[p]er se and rule-of-reason analysis are . . . two methods of determining whether a restraint is 'unreasonable,' *i.e.*, whether its anticompetitive effects outweigh its procompetitive effects."). As the Supreme Court held in *Leegin Creative Leather Prods.* v. *PSKS, Inc.*, "[t]o justify a *per se* prohibition a restraint must have manifestly anticompetitive effects . . . and lack any redeeming virtue . . . ." 551 U.S. 877, 886 (2007) (internal citations and ellipses omitted). And the Court explicitly held in *Broadcast Music, Inc.* v. *Columbia Broadcasting System., Inc.*, 441 U.S. 1 (1979), that blanket licensing of broadcast music by performance rights organizations was subject to a rule of reason rather than *per se* rule of illegality. *See also Arista Records*, 532 F. Supp. 2d at 575 n.24 (holding that horizontal agreement to impose common licensing terms on vertically related licensees are subject to rule of reason, not *per se*, analysis). As a result, even if Peloton were to establish that the Publishers reached a collective decision regarding whether to license to Peloton, that decision would be reviewed under the rule of reason.

v. *New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Peloton defines the relevant product market as "reproduction rights licenses to the copyrighted works controlled (in whole or in part) and collectively negotiated by the Coordinating Publishers through NMPA." (Counterclaims ¶ 68.) Peloton makes no allegation showing plausibly why the rights owned by the "Coordinating Publishers"— each an independent publisher not affiliated with a major record label—are not substitutable for rights owned by other publishers, including the major and independent publishers with whom Peloton has licenses. All that Peloton alleges is that, since rights are often partial or fractional, being blocked from access to the "Coordinating Publishers" repertory forecloses Peloton's access to reproduction of any music of which the Coordinating Publishers own even a share of the rights. (Counterclaims ¶ 69.) However, that does not explain why the set of songs that the "Coordinating Publishers" can block Peloton from playing through their fractional rights are not substitutable with other songs, in which the "Coordinating Publishers" have no fractional rights. There is no allegation in the Counterclaim showing that the rights effectively controlled by the "Coordinating Publishers" through their fractional ownership are not substitutable with other musical compositions. As a result, Peloton has failed to allege a proper relevant product market.

"Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). Peloton must therefore define the relevant product market by reference to the sync licenses that are required to provide a virtual cycling service. Unlike in cases like *Meredith Corp.* v. *SESAC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014), where the court allowed a

17

relevant market to be defined in the repertory of a performance rights organization ("PRO") because all television stations needed access to the entire music repertory of each PRO, Peloton makes no factual allegation showing that its service is dependent on its access to any particular quantity or repertory of music.  To the contrary, Peloton specifically alleges that instructors select music suitable in "feel and tempo" to play from a song list and that "unlike music streaming services, Peloton does not need licenses to all or even most music to provide a compelling experience for Peloton users."  (Counterclaims ¶¶ 6, 35.)  Given those allegations, Peloton's proposed relevant market consisting of just the reproduction rights controlled by the "Coordinating Publishers" is plainly insufficient.  This is yet another reason that its antitrust claims fail.

## II.

### PELOTON FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

Peloton fails to state a plausible claim of tortious interference with prospective economic relations[8] against NMPA.  "In order to state a claim for tortious interference with prospective economic relations, a plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  *Ace Arts, LLC* v. *Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 452 (S.D.N.Y. 2014) (quoting *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)).

---

[8]   "Courts refer to this cause of action by a number of different names, including prospective economic advantage, beneficial business relations, prospective business advantage, and business or economic relations.  Regardless of which term or phrase is used, the same legal standards apply."  *Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 465 n.23 (S.D.N.Y. 2006) (internal citations and quotation marks omitted).

As this Court has recognized for decades, a claim for tortious interference with prospective business relations is "very difficult to sustain." *Kramer* v. *Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995).

Peloton's claim fails for at least two separate but independently sufficient reasons. *First*, even assuming, *arguendo*, that NMPA intentionally interfered with Peloton's business relations with various music publishers, Peloton has failed to plead facts sufficient to show that NMPA's interfering conduct was criminal, independently tortious, or taken for the sole purpose of inflicting harm on Peloton. *Second*, Peloton has failed to allege that it would have entered into synchronization licenses with music publishers "but for" NMPA's conduct.

## A.   PELOTON FAILS TO CLEAR THE "PARTICULARLY HIGH HURDLE" OF STATING A CLAIM THAT NMPA'S CONDUCT CONSTITUTED A CRIME, AN INDEPENDENT TORT, OR AN ACT THE *SOLE* PURPOSE OF WHICH WAS INTENTIONALLY TO HARM PELOTON

Peloton fails to plead adequately that NMPA's conduct constituted a crime or an independent tort, or that NMPA's actions were taken for the sole purpose of inflicting harm upon Peloton, rather than pursuant to the permissible and "normal economic self-interest" of its member publishers. *See 16 Casa Duse, LLC* v. *Merkin*, 791 F.3d 247, 262 (2d Cir. 2015).

To sustain a claim for tortious interference, Peloton faces "a particularly high hurdle, for it requires a plaintiff to show that the defendant committed a crime or an independent tort such as fraud, or acted for the *sole* purpose of inflicting intentional harm on the plaintiff." *Confido Advisors, LLC* v. *USAA Real Estate Co.*, No. 17 Civ. 5632 (JFK), 2018 WL 4265900, at *9 (S.D.N.Y. Sept. 6, 2018) (internal quotations and brackets omitted) (emphasis added).  Conduct in this latter, narrow intentional harm category must

be "motivated by spite," rather than by mere "indifferen[ce]." *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 190–91 (N.Y. 2004).  Only in "rare"[9] circumstances, "extreme and unfair" "economic pressure" may suffice to establish the "wrongful means" necessary to satisfy the third element.  *Carvel*, 3 N.Y.3d at 192–93.

Allegations that a defendant acted in its economic self-interest "*undermine a finding of [the requisite] malice.*"  *Solmetex, LLC* v. *Dental Recycling of N. Am., Inc.*, No. 17-cv-860 (JSR), 2017 WL 2840282, at *5 n.10 (S.D.N.Y. June 26, 2017) (emphasis added) (dismissing claim of tortious interference with prospective business involving mere misrepresentations where "the pleadings . . . recount[ed] that" the defendant acted in its economic self-interest).  New York law is unequivocal that where a defendant's conduct is "*even partially*" motivated by pursuing its own economic interests, the alleged misconduct cannot constitute the intentional infliction of harm, unless it is fraudulent or criminal.  *Kahn* v. *Salomon Bros., Inc.*, 813 F. Supp. 191, 195 (E.D.N.Y. 1993) (emphasis added).  Moreover, it is settled law in this Court that a defendant's alleged mere "misrepresentations" directed at a plaintiff's specific potential business relations are insufficient to satisfy this demanding standard.  *Friedman* v. *Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170–71 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009) ("[M]isrepresentations do not constitute 'wrongful means' *per se* . . . .  [M]isstatements can only support [a] claim for tortious interference if they were taken solely out of malice or amount to 'extreme and unfair' economic pressure.").

---

9    "While economic pressure brought to bear by one contracting party on the other may, on rare occasions, be tortious, it cannot constitute . . . interference with economic relations."  *Carvel*, 3 N.Y.3d at 192 (internal citations omitted).

Nowhere does Peloton plead facts that would support a showing that NMPA committed a crime or an independent tort, such as fraud, or that it acted with the *sole* purpose of inflicting intentional harm on the plaintiff.  *See Confido Advisors*, 2018 WL 4265900, at *9.  Peloton merely and conclusorily alleges that "NMPA acted with the purpose of harming Peloton . . . by using dishonest, unfair, and improper means" by (1) undertaking "anticompetitive collusion"; (2) providing and using "information (and misinformation) to Coordinating Publishers in violation of the NMPA – Peloton NDA"; and (3) "making misrepresentations (about Peloton and its prior negotiations with NMPA) to individual publishers with whom Peloton was negotiating."  (Counterclaims ¶ 104.) Such bare bones allegations fail to state a claim.  *See, e.g., Lions Gate Entm't Corp.* v. *Icahn*, No. 10 CV 08169(HB), 2011 WL 1217245, at *2 (S.D.N.Y. Mar. 30, 2011) ("Plaintiff points to no facts from which to draw an inference that [defendant] acted 'solely' out of malice or used improper means.  The complaint contains only conclusory statements[,]" and those "threadbare recitals of the elements . . . do not suffice.") (internal citations and quotations omitted).

In fact, the Counterclaims preclude any finding that NMPA acted with the sole purpose of inflicting intentional harm on Peloton.  Peloton acknowledges that NMPA engaged in collective negotiations on behalf of music publishers with the intent to "obtain compensation for all past, present, and future uses of musical works," insisted "on compensation for all its member publishers that had not previously entered into agreements with Peloton," and "exchanged with Peloton proposals and counter-proposals regarding contract terms (including prices for licenses)."  (Counterclaims ¶¶ 33, 35, 38 (internal quotation marks omitted).)  These allegations "*undermine* a finding of [the requisite]

21

malice." *See Solmetex*, 2017 WL 2840282, at *5 n.10 (emphasis added); *see also 16 Casa Duse*, 791 F.3d at 262–63.  NMPA's economically motivated conduct, taken to further its member publishers' economic interests, cannot constitute intentional infliction of harm. To state a claim, Peloton must therefore allege the commission of a crime or independent tort.  *See Kahn*, 813 F. Supp. at 195.

Nor do alleged violations of the NMPA – Peloton NDA support the inference of the commission of a crime or an independent tort.  Rather, the alleged wrongful disclosure of information could at most constitute a breach of contract.  *See Rockland Exposition, Inc.* v. *All of Auto. Serv. Providers of N.J.* 894 F. Supp. 2d 288, 334 (S.D.N.Y. 2012) ("[A] breach of contract is insufficient to sustain a cause of action for tortious interference with business relationships.").  Nor can Peloton's allegations support an inference that the sole purpose of such disclosure was to intentionally harm Peloton. Peloton itself alleges that the motive of NMPA's alleged breach was "to interfere with individual publishers' ensuing negotiations with Peloton . . . and to orchestrate the commencement of this lawsuit."  (Counterclaims ¶ 41.)  The filing of a non-frivolous lawsuit cannot constitute "improper means."  *See 10 Ellicott Square Court Corp.* v. *Violet Realty, Inc.*, 81 A.D.3d 1366, 1367 (N.Y. App. Div. 4th Dep't 2011).

It is settled law that any alleged "misrepresentations (about Peloton and its prior negotiations with NMPA)" made by NMPA "to individual publishers with whom Peloton was negotiating" are insufficient to satisfy Peloton's pleading burden.  *See Friedman*, 551 F. Supp. 2d at 170–71 (S.D.N.Y. 2008).  Even though "misrepresentations can constitute dishonest, unfair, or improper means, they must rise to the level of an independent tort to do so."  *See Solmetex*, 2017 WL 2840282, at *5.  Peloton alleges NMPA

made those supposed misrepresentations "with the purpose of disrupting Peloton's negotiations with such publishers," (Counterclaims ¶ 104), but even if NMPA acted with such a purpose, Peloton's own allegations support an inference that it also acted at least partially to advance its members' economic interests.  (*See id*. ¶¶ 33, 35, 38.)  Any alleged misrepresentations were, therefore, not made for the *sole* purpose of intentionally inflicting harm on Peloton.

*Finally*, Peloton's allegations that "NMPA placed significant pressure upon certain" non-Plaintiff music publishers "(as it did with the Coordinating Publishers) to cease direct individual discussions with Peloton and to collectively negotiate only through NMPA" (Counterclaims ¶ 61), fail to constitute the "rare" circumstances in which "extreme and unfair" "economic pressure" suffices to establish the "wrongful means" element.  *See Carvel*, 3 N.Y.3d at 192–93.  These conclusory allegations are unsupported by any facts whatsoever as to how NMPA exerted alleged "economic pressure" on music publishers or the extent to which it was "extreme and unfair."  To the contrary, Peloton's own admission that it "was able to reach agreements with certain music publishers who had initially been a part of the group NMPA had purportedly represented," (Counterclaims ¶ 61), undercuts any allegations of the placement of "extreme and unfair economic pressure" by NMPA upon music publishers.

**B.      PELOTON FAILS TO ALLEGE THAT IT WOULD HAVE
           ENTERED INTO SYNCHRONIZATION LICENSES WITH
           MUSIC PUBLISHERS "BUT FOR" THE NMPA'S CONDUCT**

Peloton's tortious interference claim independently fails because Peloton has not alleged that it would have entered into synchronization licenses with music publishers "but for" NMPA's conduct.

Peloton's pleading burden "requires not only 'but for' causation," or "that the plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct, . . . but also that the defendant's interference be direct." *Ortiz* v. *Todres & Co., LLP*, No. 15 Civ. 1506 (LGS), 2019 WL 1207856, at *6 (S.D.N.Y. Mar. 14, 2019) (internal citation and quotation marks omitted); *see also Riddell Sports Inc.* v. *Brooks*, 872 F. Supp. 73, 78 (S.D.N.Y. 1995). "The 'would have been entered into' requirement is stringently construed, requiring more probability than 'being reasonably certain' or 'having a reasonable expectation.'" *Weiss/Watson, Inc.* v. *Lange*, No. 87 CIV 0032 (JFK), 1990 WL 33601, at *4 (S.D.N.Y. March 21, 1990).

Peloton fails to satisfy this "but for" causal requirement. Peloton only asserts that it "*had a reasonable expectancy* of future business relationships for the licensing of copyrights." (Counterclaims ¶ 101) (emphasis added). A "reasonable expectancy" of future business relationships fails to satisfy the "but for" requirement. *See Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 405 (S.D.N.Y. 2019) (plaintiff's allegation that it "*had an opportunity and expectation* of entering into an agreement with [a specified third party]" is insufficient) (emphasis added).

Nor does Peloton provide any plausible facts whatsoever in support of its vague assertion that "up until the time" NMPA allegedly took "efforts to coordinate a concerted refusal to deal with Peloton," "music publishers were prepared to negotiate and issue licenses to Peloton." (Counterclaims ¶ 102.) Peloton does not identify a single license agreement with any of the Publishers that it "*would have entered into*" but for NMPA's conduct. *See Ortiz*, 2019 WL 1207856, at *6 (emphasis added). Although Peloton alleges that it sent term sheets and NDAs to certain publishers (*see* Counterclaims

¶¶ 42–62), it does not allege any facts suggesting that "but for" NMPA's purported "direct" interference, Peloton's negotiations with the Publishers "would have coalesced into actual" licenses. *See Riddell Sports*, 872 F. Supp. at 78.

## CONCLUSION

For these reasons, Counterclaim-Defendants respectfully request that the Court dismiss the Counterclaims in their entirety and with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

Dated:  New York, New York
             June 24, 2019

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ Jay Cohen_____
            Jay Cohen
            Darren W. Johnson
            Elana R. Beale

1285 Avenue of the Americas
New York, New York 10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
jaycohen@paulweiss.com
djohnson@paulweiss.com
ebeale@paulweiss.com

*Attorneys for Counterclaim Defendants*