UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOWNTOWN MUSIC PUBLISHING LLC, OLE MEDIA MANAGEMENT, L.P., BIG DEAL MUSIC, LLC, CYPMP, LLC, PEER INTERNATIONAL CORPORATION, PSO LIMITED, PEERMUSIC LTD., PEERMUSIC III, LTD., PEERTUNES, LTD., SONGS OF PEER LTD., RESERVOIR MEDIA MANAGEMENT, INC., THE RICHMOND ORGANIZATION, INC., DEVON MUSIC, INC., ESSEX MUSIC, INC., ESSEX MUSIC INTERNATIONAL, INC., FOLKWAYS MUSIC PUBLISHERS, INC., HAMPSHIRE HOUSE PUBLISHING CORP., HOLLIS MUSIC, INC., LUDLOW MUSIC, INC., MELODY TRAILS, INC., MUSICAL COMEDY PRODUCTIONS, INC., PALM VALLEY MUSIC, LLC, WORDS & MUSIC, INC., ROUND HILL MUSIC LLC, ROUND HILL MUSIC LP, THE ROYALTY NETWORK, INC., and ULTRA INTERNATIONAL MUSIC PUBLISHING, LLC, | No. 1:19-cv-02426-DLC |
| *Plaintiffs and Counterclaim Defendants, and* | |
| GREENSLEEVES PUBLISHING LIMITED, ME GUSTA MUSIC, LLC, STB MUSIC, INC., and TUNECORE, INC., | |
| *Plaintiffs, and* | |
| NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC., | |
| *Counterclaim Defendant.* | |
| v. | |
| PELOTON INTERACTIVE, INC. | |
| *Defendant and Counterclaim Plaintiff.* | |

**ANSWER TO SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
AGAINST NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC. AND
<u>PLAINTIFF PUBLISHERS</u>**

## ANSWER

Defendant Peloton Interactive, Inc. hereby answers the Second Amended Complaint filed by Plaintiffs Downtown Music Publishing LLC, Anthem Entertainment L.P. (f/k/a ole Media Management, L.P.), Big Deal Music, LLC, CYPMP LLC d/b/a Pulse Music Group, Peer International Corporation, PSO Limited, Peermusic Ltd., Peermusic III, Ltd., Peertunes, Ltd., Songs of Peer, Ltd. (collectively, "Peer"), Greensleeves Publishing Limited, Me Gusta Music, LLC, Reservoir Media Management, Inc., The Richmond Organization, Inc., Devon Music, Inc., Essex Music, Inc., Essex Music International, Inc., Folkways Music Publishers, Inc., Hampshire House Publishing Corp., Hollis Music, Inc., Ludlow Music, Inc., Melody Trails, Inc., Musical Comedy Productions, Inc., Palm Valley Music, LLC, Words & Music, Inc. (collectively, "TRO"), Round Hill Music LLC, Round Hill Music LP (collectively, "Round Hill"), The Royalty Network, Inc., STB Music, Inc., TuneCore, Inc., and Ultra International Music Publishing, LLC.

## General Denial

Except as otherwise expressly admitted herein, Peloton denies each and every allegation set forth in the Complaint, including, without limitation, any allegations set forth in the preamble, headings and subheadings of the Complaint. Pursuant to Rule 8 of the Federal Rules of Civil Procedure, allegations in the Complaint to which no responsive pleading is required, including legal arguments and legal conclusions, shall be deemed as denied. Peloton expressly reserves the right to seek to amend and/or supplement its Answer as may be necessary, including the right to assert and rely upon any additional defenses as may be discovered.

## Response to Specific Allegations

Incorporating the foregoing, Peloton states as follows in response to the specific allegations in the Complaint:

## **Nature of the Action**

1.     Peloton admits that Plaintiffs have filed the current action and purport to seek more than $300,000,000 in damages from Peloton. Peloton further admits that it has entered into license agreements with many copyright holders. Peloton denies that it "used more than 2,000 musical works owned or administered by Plaintiffs over a period of years in the videos that it makes available to its hundreds of thousands of customers without a synchronization (or "sync") license for a single one of those songs." Peloton further denies that it is continuing to violate copyright laws by creating new workout videos containing works owned or administered by Plaintiffs. The remaining allegations in Paragraph 1, including Plaintiffs' characterizations of Peloton's conduct as "a textbook willful infringer," "knowing and reckless," and "trampling the rights of Plaintiffs," as well as Plaintiffs' characterizations of copyright law, are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 1.

2.     Peloton admits that Plaintiffs have identified three musical works in Paragraph 2 that they claim to own or control, in whole or part. Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 2 concerning the extent of Plaintiffs' ownership of or control in certain musical works. The remaining allegations in Paragraph 2, including Plaintiffs' characterization of Peloton's conduct as "unlawful infringement," are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 2.

3.     The substance of Plaintiffs' description of the Peloton service is admitted. Plaintiffs' characterization of the level of success of Peloton as a company is a nonfactual statement to which no response is required.

4.      Peloton admits that it publishes playlists for some archived class videos and that it classifies some videos based on the specific music genres. Peloton denies that all Peloton videos "contain music from start to finish." The remaining allegations in Paragraph 4 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 4.

5.      Peloton admits that it issued a press release on June 27, 2018 containing the language quoted in Paragraph 5. Peloton further admits that there have been press reports to the effect that Peloton has been valued close to $8 billion. Peloton specifically denies that it "deliberately decided to use Plaintiffs' musical works without any regard for the rights of thousands of songwriters and creators." The remaining allegations in Paragraph 5 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 5.

6.      Peloton admits that it has sought and obtained licenses from owners of copyrighted works included in Peloton workout classes. Peloton admits that it does not currently have catalog-wide synchronization license agreements with any of the Plaintiffs, but it avers that it has limited-use license agreements with some of the Plaintiffs. Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 6 concerning the extent of Plaintiffs' ownership, control, or copyright interest in certain musical compositions and on that basis denies them. The remaining allegations in Paragraph 6 are nonfactual legal arguments and legal conclusions to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 6.

7.      The allegations in Paragraph 7 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the allegations in Paragraph 7.

### The Parties

8.      Peloton admits that it does not currently have in place licensing agreements with any of the Plaintiffs granting catalog-wide synchronization rights to Peloton, but it avers that it has limited-use license agreements with some of the Plaintiffs. Peloton lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 8 and therefore denies them.

9.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 9 and therefore denies them.

10.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 10 and therefore denies them.

11.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 11 and therefore denies them.

12.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 12 and therefore denies them.

13.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 13 and therefore denies them.

14.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 14 and therefore denies them.

15.      Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 15 and therefore denies them.

16.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 16 and therefore denies them.

17.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 17 and therefore denies them.

18.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 18 and therefore denies them.

19.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 19 and therefore denies them.

20.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 20 and therefore denies them.

21.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 21 and therefore denies them.

22.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 22 and therefore denies them.

23.     Peloton admits that it is a corporation organized under the laws of Delaware and that its principal place of business is located in New York, NY. Peloton also admits that it sells stationary fitness bikes and treadmills and streams workout videos that contain music to its subscriber members. Peloton denies the remaining allegations and characterizations in Paragraph 23.

**Jurisdiction and Venue**

24.     Paragraph 24 contains only conclusions of law to which no response is required.

25.     Peloton admits, for purposes of this action, that it has conducted business activities within the State of New York and within the District. Peloton also admits, for purposes of this

action, that its principal place of business is within the District. The remaining allegations in Paragraph 25 are nonfactual legal arguments to which no response is required.

26.     Peloton admits, for purposes of this action, that its principal place of business is within the District. The remaining allegations in Paragraph 26 are nonfactual legal arguments and legal conclusions to which no response is required.

## The Facts

**Subheading: "Plaintiffs' Exclusive Synchronization Rights"**

**Response to Subheading:** Peloton lacks sufficient knowledge or information to admit or deny the allegations in this subheading, including that Plaintiffs are "exclusive" owners of synchronization rights in the works at issue, and therefore denies them.

27.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 27 and therefore denies them.

28.     Paragraph 28 contains only conclusions of law to which no response is required.

29.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 29 and therefore denies them.

30.     Peloton lacks sufficient knowledge or information to admit or deny allegations in Paragraph 30 concerning Plaintiffs' ownership, control, or copyright interest in certain musical compositions and on that basis denies them. Peloton also lacks sufficient knowledge or information to admit or deny allegations regarding the extent to which the works at issue are "written by more than one songwriter, each of whom may be affiliated with a separate music publisher," and on that basis denies them. The remaining allegations in Paragraph 30 are nonfactual legal arguments and conclusions of law to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 30.

31.     Paragraph 31 contains only legal arguments and conclusions of law to which no response is required.

**Subheading: "Plaintiffs' Copyrighted Musical Works"**

**Response to Subheading:** Peloton lacks sufficient knowledge or information to admit or deny the allegations in this subheading, including whether Plaintiffs own or control rights in the musical works described in this section of the Complaint, and therefore denies them.

32.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 32 and therefore denies them.

33.     Peloton admits that Plaintiff Downtown has identified in Paragraph 32 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Downtown. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 33, and, on that basis, denies them.

34.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 34 and therefore denies them.

35.     Peloton admits that Plaintiff Anthem has identified in Paragraph 34 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Anthem. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 35, and, on that basis, denies them.

36.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 36 and therefore denies them.

37.     Peloton admits that Plaintiff Big Deal has identified in Paragraph 36 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Big Deal. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 37, and, on that basis, denies them.

38.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 38 and therefore denies them.

39.     Peloton admits that Plaintiff Peer has identified in Paragraph 38 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Peer. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 39, and, on that basis, denies them.

40.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 40 and therefore denies them.

41.     Peloton admits that Plaintiff Pulse has identified in Paragraph 40 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Pulse. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 41, and, on that basis, denies them.

42.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 42 and therefore denies them.

43.     Peloton admits that Plaintiff Greensleeves has identified in Paragraph 42 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton

has not entered into a catalog-wide synchronization license agreement with Plaintiff Greensleeves. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 43, and, on that basis, denies them.

44.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 44 and therefore denies them.

45.     Peloton admits that Plaintiff Me Gusta has identified in Paragraph 44 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Me Gusta. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 45, and, on that basis, denies them.

46.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 46 and therefore denies them.

47.     Peloton admits that Plaintiff Reservoir has identified in Paragraph 46 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Reservoir. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 47, and, on that basis, denies them.

48.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 48 and therefore denies them.

49.     Peloton admits that Plaintiff TRO has identified in Paragraph 48 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff TRO. Peloton lacks

sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 49, and, on that basis, denies them.

50.    Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 50 and therefore denies them.

51.    Peloton admits that Plaintiff Round Hill has identified in Paragraph 50 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Round Hill. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 51, and, on that basis, denies them.

52.    Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 52 and therefore denies them.

53.    Peloton admits that Plaintiff Royalty has identified in Paragraph 52 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Royalty. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 53, and, on that basis, denies them.

54.    Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 54 and therefore denies them.

55.    Peloton admits that Plaintiff STB has identified in Paragraph 54 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff STB. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 55, and, on that basis, denies them.

56.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 56 and therefore denies them.

57.     Peloton admits that Plaintiff TuneCore has identified in Paragraph 56 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff TuneCore. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 57, and, on that basis, denies them.

58.     Peloton lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 58 and therefore denies them.

59.     Peloton admits that Plaintiff Ultra has identified in Paragraph 58 what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has entered into a catalog-wide synchronization license agreement with Plaintiff Ultra that has since expired. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 59, and, on that basis, denies them.

60.     Peloton admits that Plaintiffs have set forth on Exhibit A what they claim to be a list of musical works owned or controlled by them, in whole or part. Peloton lacks sufficient knowledge or information to admit or deny the allegations: about what "Plaintiffs [claim to] have identified" in respect of certain videos that Peloton has made or currently makes available; that Plaintiffs' "own or control (in entirety or in part)" the compositions listed on Exhibit A; and that the compositions listed on Exhibit A have been registered with the U.S. Copyright Office; and on that basis Peloton denies such allegations. The remaining allegations in Paragraph 60 are nonfactual legal arguments to which no response is required. To the extent a response is required, Peloton denies the remaining allegations in Paragraph 60.

61.     Peloton admits that Plaintiff Downtown has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Downtown. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 61, and, on that basis, denies them.

62.     Peloton admits that Plaintiff Anthem has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Anthem. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 62, and, on that basis, denies them.

63.     Peloton admits that Plaintiff Big Deal has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Big Deal. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 63, and, on that basis, denies them.

64.     Peloton admits that Plaintiff Peer has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Peer. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 64, and, on that basis, denies them.

65.     Peloton admits that Plaintiff Pulse has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Pulse. Peloton lacks sufficient

knowledge or information to admit or deny any of the remaining allegations in Paragraph 65, and, on that basis, denies them.

66.     Peloton admits that Plaintiff Greensleeves has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Greensleeves. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 66, and, on that basis, denies them.

67.     Peloton admits that Plaintiff Me Gusta has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Me Gusta. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 67, and, on that basis, denies them.

68.     Peloton admits that Plaintiff Reservoir has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Reservoir. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 68, and, on that basis, denies them.

69.     Peloton admits that Plaintiff TRO has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff TRO. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 69, and, on that basis, denies them.

70.     Peloton admits that Plaintiff Round Hill has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Round Hill. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 70, and, on that basis, denies them.

71.     Peloton admits that Plaintiff Royalty has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff Royalty. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 71, and, on that basis, denies them.

72.     Peloton admits that Plaintiff STB has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff STB. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 72, and, on that basis, denies them.

73.     Peloton admits that Plaintiff TuneCore has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has not entered into a catalog-wide synchronization license agreement with Plaintiff TuneCore. Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 73, and, on that basis, denies them.

74.     Peloton admits that Plaintiff Ultra has set forth on Exhibit A what it claims to be a list of musical works owned or controlled by it, in whole or part, and that Peloton has entered into a catalog-wide synchronization license agreement with Plaintiff Ultra that has since expired.

Peloton lacks sufficient knowledge or information to admit or deny any of the remaining allegations in Paragraph 74, and, on that basis, denies them.

75.     Peloton admits that the three musical works identified in Paragraph 75 have been used in Peloton workout videos at times since 2017, and that Peloton has not entered into catalog-wide synchronization license agreements with any of the Plaintiffs (except for Plaintiff Ultra, which license has expired). Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 75 concerning the extent of Plaintiffs' ownership or control of certain musical compositions and on that basis denies them. The remaining allegations in Paragraph 75 are nonfactual legal arguments to which no response is required. To the extent a response is required, Peloton denies the remaining allegations in Paragraph 75.

**Subheading: "Peloton Builds a Highly Successful Business by Infringing Plaintiffs' Copyrights"**

**Response to Subheading:** This subheading contains only legal arguments to which no response is required.

76.     Peloton admits: that it was founded in 2012; that it has sought to develop a profitable business involving an in-studio cycling experience that consumers could use in their own homes when they wished to do so; that it offers, provides and/or sells equipment and streaming workout videos for at-home stationary bike and treadmill fitness; and that it has expanded its offerings to include yoga, strength and other exercise classes available live and via streaming video. Peloton lacks sufficient knowledge or information to admit or deny the remaining characterizations/allegations in Paragraph 76 and therefore denies them.

77.     Admitted.

78.    Peloton denies the accuracy of the description of the Peloton service offering, except that it admits that Peloton subscribers receive access to thousands of recorded videos with their monthly subscription which they can enjoy in the comfort of their own home, and that in addition to the $39 monthly subscription service for the Peloton Bike, Peloton offers a mix of cycling, running, bootcamp, yoga, strength and outdoor workouts through Peloton Digital for $19.49 per month.

79.    Peloton admits that its Form S-1, as filed with the U.S. Securities and Exchange Commission, and a previously-issued press release contain the language quoted in Paragraph 79. The remaining allegations in Paragraph 79 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 79.

80.    Peloton admits that it has entered into licenses inclusive of synchronization rights with many owners of musical works other than the Plaintiffs. Peloton admits that it has not entered into catalog-wide license agreements with any Plaintiffs other than Ultra, but it avers that it has limited-use license agreements with some of the Plaintiffs. Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 80 concerning the extent of Plaintiffs' ownership, control, or copyright interest in certain musical compositions and on that basis denies them. The remaining allegations in Paragraph 80 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 80 (including specifically the allegation that Peloton has willfully infringed Plaintiffs' copyrights).

81.    Peloton denies the accuracy of the description of Peloton's subscriber numbers. Peloton admits Plaintiffs' allegations in Paragraph 81 relating to individuals with a Peloton

account, and revenue growth, that Peloton has built a successful business and that there have been press reports to the effect that Peloton has been valued close to $8 billion. Peloton denies the accuracy of Plaintiffs' allegations concerning the percentage of Peloton's total revenue that is used to pay rightsholders. The remaining allegations in Paragraph 81 are nonfactual legal arguments to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 81.

**Subheading: "Plaintiffs' Discovery of Peloton's Infringing Conduct"**

**Response to Subheading:** This subheading contains only a legal conclusion to which no response is required.

82.     Peloton denies the accuracy of the description of the Peloton service offering, except it admits that a Peloton subscription is needed to access Peloton's videos. Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 82 concerning the extent of Plaintiffs' ownership of or control in certain musical works. The remaining allegations in Paragraph 82, including Plaintiffs' characterization of Peloton's conduct as having "effectively concealed" claimed "mass copyright infringement," are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 82.

**Subheading: "Plaintiffs' Injury"**

**Response to Subheading:** This subheading contains only a legal conclusion to which no response is required.

83.     Peloton lacks sufficient knowledge or information to admit or deny any allegations in Paragraph 83 concerning the extent of Plaintiffs' ownership, control, or copyright interest in certain musical compositions and on that basis denies them. The remaining allegations in

Paragraph 83 are nonfactual legal arguments and conclusions of law to which no response is required. To the extent a response is deemed required, Peloton denies the remaining allegations in Paragraph 83.

## Claim for Relief
### (Copyright Infringement)

84.    Peloton restates and incorporates by reference its responses to all allegations in Paragraphs 1 through 83.

85.    Peloton lacks sufficient knowledge or information to admit or deny the allegation that Plaintiffs own or control the compositions listed on Exhibit A and the allegation that the compositions listed on Exhibit A have been registered with the U.S. Copyright Office, and, on that basis, Peloton denies such allegations. The remaining allegations in Paragraph 85 are nonfactual legal arguments to which no response is required. To the extent a response is required, Peloton denies the remaining allegations in Paragraph 85.

86.    Paragraph 86 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Peloton denies the allegations in Paragraph 86.

87.    Peloton lacks sufficient knowledge or information to admit or deny that Plaintiffs have exclusive rights in the compositions. Paragraph 87 otherwise contains only legal arguments and conclusions of law to which no response is required. To the extent an additional response is required, Peloton denies the allegations in Paragraph 87.

88.    Paragraph 88 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Peloton denies the allegations in Paragraph 88.

89.     Paragraph 89 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Peloton denies the allegations in Paragraph 89.

90.     Paragraph 90 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Peloton denies the allegations in Paragraph 90.

## Answer to Prayer for Relief

Peloton denies that Plaintiffs are entitled to relief against Peloton, and requests that the Court dismiss all claims against Peloton with prejudice and order such further relief as the Court deems just and proper.

## Answer to Jury Demand

Peloton admits that Plaintiffs purport to demand a jury trial, while reserving all rights in connection therewith.

## Peloton's Affirmative Defenses

Peloton sets forth below its affirmative defenses. By setting forth these affirmative defenses, Peloton does not assume the burden of proving any fact, issue or element of a claim where such burden properly belongs to Plaintiffs. In support of its affirmative defenses, Peloton hereby incorporates by reference all factual allegations set out elsewhere in this document, including all allegations contained in Peloton's counterclaims. As separate affirmative defenses, Peloton alleges as follows:

### First Affirmative Defense
**(Lack of Ownership and Failure to Register)**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing to assert the claims alleged in this action, for reasons including lack of ownership and lack of proper registration.

### Second Affirmative Defense
**(Estoppel, Acquiescence, and Waiver)**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel, acquiescence and/or waiver.

### Third Affirmative Defense
**(Unclean Hands)**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### Fourth Affirmative Defense
**(Copyright Misuse)**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of copyright misuse.

### Fifth Affirmative Defense
**(Statute of Limitations)**

Plaintiffs' claims are barred, in whole or part, by the applicable statute of limitations.

### Sixth Affirmative Defense
**(License)**

Plaintiffs' claims are barred, in whole or in part, because the uses of the musical compositions at issue were licensed or authorized pursuant to an implied license.

### Seventh Affirmative Defense
**(Failure to Mitigate Damages)**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to mitigate their alleged damages.

## COUNTERCLAIMS AGAINST NMPA AND PLAINTIFF PUBLISHERS

1.      Peloton is not the bad actor that Plaintiffs portray it to be. Peloton values the musical element of its service offering and respects—and pays—the music rightsholders associated with that offering. It has sought and obtained licenses from all the "major" record labels and many independent labels. It has also sought and obtained licenses from, and is paying, all the "major" publishers, many independent publishers, and the performing rights organizations representing all the songwriters and publishers whose music Peloton streams.

2.      In fact, Peloton has invested heavily in creating the infrastructure and systems to facilitate appropriate licensing for its service offering, which presented a novel use case to the music industry. A pioneering component of the service developed by Peloton enables users to access recorded versions of its workout classes. Music publishers' traditional practices for licensing reproduction rights for television shows and feature films were ill-suited for this aspect of Peloton's service (which fitness consumers sought and expected). Traditional "sync" licenses are issued on an individual composition basis, one by one, and well in advance of exhibition of the content. But Peloton's service called for multiple (or catalog-based) reproduction rights clearances to cover the music that instructors wish to incorporate into their classes, which are planned only days, or sometimes hours, in advance. As a result, Peloton has worked proactively and collaboratively with the music publishing industry to develop a licensing structure (and supporting systems) to address its unique use case. And it has secured reproduction rights licenses from all the "major" music publishers and many independent music publishers.

3.      Why are we here then? Because of the anticompetitive and tortious conduct of the Counterclaim Defendant National Music Publishers' Association, Inc. ("NMPA"). Specifically, NMPA has instigated a coordinated effort with the Counterclaim Defendant music publishers (the

"Coordinating Publishers") to fix prices and to engage in a concerted refusal to deal with Peloton. Through these actions, NMPA has exceeded the bounds of legitimate conduct for a trade association and become the ringleader of concerted activity among would-be competitor music publishers, all in violation of the antitrust laws. NMPA has also knowingly acted to impede direct negotiations between music publishers and Peloton in a manner that constitutes tortious interference with Peloton's business relationships. These unlawful actions have harmed Peloton, have harmed competition, and will continue to harm both until enjoined by this Court.

## **Background**

### A.     **Peloton**

4.     Peloton sits at the nexus of technology, media, and fitness. It is the gold standard for interactive at-home fitness equipment and content. Peloton was formed in 2012 in New York City. After extensive research and development, it brought to market its first product, the Peloton Bike. The Peloton Bike is a best-in-class stationary bike with a built-in HD touchscreen that displays live and on-demand group workout classes led by elite fitness instructors through a connected software platform where riders can track their fitness and engage with other members in the community.

5.     The Peloton Bike simulates the experience of an in-studio group cycling class, but from the comfort of the rider's own home. Peloton operates an indoor cycling studio in New York City, at which members of the public take instructor-led group cycling classes which are streamed in real-time to home riders of the Peloton Bikes. Those live streamed classes are also recorded and archived in Peloton's on-demand library (now consisting of thousands of classes) for later consumption by home riders of the Peloton Bikes. The Bike tracks performance metrics such as resistance, cadence, and output during a ride. Total output—a composite of resistance and cadence—is displayed on a leaderboard that compares the user to other riders and to his or her own

past performance. And by providing variations of the live leaderboard in on-demand classes, the Bike recreates the real-time competition and community-centered aspects of a class (like allowing riders to give each other "high-fives") that make in-studio group cycling classes so popular. Peloton recently launched an at-home treadmill, the Peloton Tread, that applies the same concept to running, walking, and boot camp cardio. Bike or Tread users, or those who subscribe to Peloton's app-only offering, Peloton Digital, can also take outdoor running, stretching, strength training, yoga, and meditation classes from their favorite Peloton instructors.

6.      One component of these instructor-led classes—and the one that gave rise to this lawsuit—is music. Instructors choose music to play during their classes, curating playlists of songs that are suitable for the feel and tempo desired by the instructor. Instructors speak over the music during classes to provide real-time coaching, direction, and inspiration to members, including personalized and encouraging "shout-outs" to both in-studio and at-home riders.

### B.      NMPA and the Coordinating Publishers

7.      NMPA is the largest trade association of music publishers in the United States. It claims that its members control the copyrights to "the vast majority of musical compositions licensed . . . in the United States." David M. Israelite is its President and CEO.

8.      Whatever conduct NMPA may engage in legitimately as a trade association, it may not engage in actions to coordinate negotiations (including over price terms) or to coordinate refusals to deal among a group of otherwise-competitor music publishers. Yet that is precisely what NMPA did here.

9.      NMPA first sought to extract supracompetitive license terms from Peloton by negotiating collectively on behalf of a large (though unidentified) number of member publishers. NMPA deliberately obscured the identities of the publishers on whose behalf it was negotiating despite multiple requests by Peloton for this information. When NMPA's collective negotiations

24

with Peloton later stalled (for reasons NMPA never disclosed to Peloton), Peloton pursued direct negotiations with a number of music publishers. After participating in seemingly meaningful negotiations, however, several of the Coordinating Publishers suddenly—and virtually at the same time—cut off their negotiations and collectively refused to deal with Peloton. This refusal to deal with Peloton was at the urging of NMPA, which had taken steps to disrupt Peloton's direct negotiations with publishers, in part, by conveying misinformation to those publishers about Peloton's positions and practices. NMPA, for its part, did not act for a valid business purpose but, instead, in the words of Israelite, sought to "make an example out of" Peloton.

10.     Although not a named plaintiff, NMPA was the ringleader in the filing of the Complaint. NMPA issued a press release touting the filing on the day the Complaint was filed, and Israelite appeared on CNBC that same afternoon in a segment titled: "The man behind the Peloton lawsuit explains."

11.     NMPA's conduct here goes far beyond the permissible activities of a trade association and violates the federal antitrust laws and New York state law.

## **Counterclaim Parties**

12.     Counterclaim Plaintiff Peloton Interactive, Inc. ("Peloton") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York.

13.     Counterclaim Defendant Downtown Music Publishing LLC ("Downtown") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York.

14.     Counterclaim Defendant Anthem Entertainment L.P. (f/k/a ole Media Management, L.P.) ("Anthem") is a limited partnership organized and existing under the laws of Ontario, Canada, with its principal place of business in Toronto, Ontario.

15.     Counterclaim Defendant Big Deal Music, LLC ("Big Deal") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in California.

16.     Counterclaim Defendant "Peer" consists of a group of related entities. Peer International Corporation is organized and existing under the laws of New Jersey, with its principal place of business in New York. PSO Limited and Peermusic Ltd. are corporations organized and existing under the laws of New York, with their principal places of business in New York. Peermusic III, Ltd., Peertunes, Ltd., and Songs of Peer, Ltd. are corporations organized and existing under the laws of Delaware, with their principal places of business in New York.

17.     Counterclaim Defendant Pulse Music Group ("Pulse") is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business in California.

18.     Counterclaim Defendant Reservoir Media Management, Inc. ("Reservoir") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York.

19.     Counterclaim Defendant "TRO" consists of a group of related entities. The Richmond Organization, Inc., Devon Music, Inc., Essex Music, Inc., Essex Music International, Inc., Folkways Music Publishers, Inc., Hampshire House Publishing Corp., Hollis Music, Inc., Ludlow Music, Inc., Melody Trails, Inc., Musical Comedy Productions, Inc., and Words & Music, Inc. are corporations organized and existing under the laws of New York, with their principal

places of business in New York. Palm Valley Music, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in New York.

20.     Counterclaim Defendant "Round Hill" consists of a group of related entities. Round Hill Music LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York. Round Hill Music LP is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in New York.

21.     Counterclaim Defendant The Royalty Network Inc. ("Royalty") is a corporation organized and existing under the laws of New York, with its principal place of business in New York.

22.     Counterclaim Defendant Ultra International Music Publishing, LLC ("Ultra") is a corporation organized and existing under the laws of New York, with its principal place of business in New York.

23.     Counterclaim Defendant NMPA is a Washington-D.C.-based trade association, with its principal address at 975 F Street NW, Suite 375, Washington, DC 20004.

### Jurisdiction and Venue

24.     This Court has original subject-matter jurisdiction over counterclaims for violations of the antitrust laws of the United States under 28 U.S.C. §§ 1331, 1337; and 15 U.S.C. §§ 15, 26. This Court has related jurisdiction over the state law counterclaims under 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over each of the Coordinating Publishers. These counterclaims arise out of the same facts and circumstances as the Coordinating Publishers' initially-filed lawsuit, and those publishers consented to the personal jurisdiction of New York by filing this case in New York.

26.     This Court also has personal jurisdiction over NMPA. Jurisdiction over NMPA satisfies New York's long-arm statute for two reasons. First, NMPA transacts business within New York including, but not limited to, by entering into membership agreements with music publishers, organizing meetings between Coordinating Publishers, and negotiating with music users in New York. Second, NMPA has committed tortious acts causing injury to Peloton, a "person" within New York, and NMPA regularly does business in New York, engages in a persistent course of conduct in New York, and knew or reasonably expected that its actions would cause harm in New York. NMPA also engages in interstate commerce. These same contacts satisfy the constitutional inquiry because these counterclaims arise out of NMPA's contacts with New York.

27.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the counterclaims occurred in this judicial district.

28.     Peloton brings this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, and New York state law, to enjoin the Counterclaim Defendants' anticompetitive conduct and other violations of the law, and to recover treble damages associated with overpayments, reputational damage, and other losses Peloton has incurred by virtue of the Counterclaim Defendants' antitrust violations and tortious conduct, together with the costs of this suit and reasonable attorneys' fees.

## **Factual Allegations**

### **A.     The Early Years and Development of a Licensing Model Embraced by the Majors and Many Indie Publishers**

29.     As Peloton's business evolved, it became apparent that the existing infrastructure for sync licensing was ill-suited to address the reproduction rights licenses that were appropriate for Peloton's use case. Peloton obtained comprehensive licensing of the sound recording rights for its service via "catalog-wide" licenses (i.e., covering all or substantially all of a licensor's

repertoire) directly from the labels with whom Peloton entered into license agreements. And it obtained comprehensive licensing of the public performance rights associated with the compositions embodied in those sound recordings from the relevant performing rights organizations.

30.     But traditional sync licensing of musical works has historically been conducted on an individual song-by-song basis where the songs are pre-determined by the licensee well in advance of their intended use. In contrast, the nature of Peloton's service offering is that such catalog-wide licenses (covering, in many cases, yet-to-be-selected songs) are more appropriate. In its early years, and during its efforts to obtain licenses, Peloton was frequently advised by publishers to defer discussions regarding reproduction rights until Peloton could demonstrate a viable business case. At the time, the publishers lacked the systems necessary to facilitate efficient reproduction rights licensing for Peloton's use case.

31.     The publishing licensing marketplace was, and continues to be, complicated further by the largely nonpublic, fractionalized, and opaque nature of ownership information regarding who owns the rights to musical works. This lack of transparency has long plagued both music licensors and licensees. In fact, this is a major issue addressed by the passage of the Music Modernization Act signed into law in late 2018, which provides for the creation of a centralized database of musical work ownership information (which has yet to be established).

32.     To address these challenges, Peloton invested substantial time and resources (costing tens of millions of dollars) developing systems and infrastructure to enable licensing mechanisms appropriate for its business. It engaged multiple third-party vendors and consultants and made substantial investments (including its acquisition in 2018 of a standalone digital music service provider and software platform, Neurotic Media, Inc.) to better position itself to address

the needs of licensors in the licensing marketplace. Facilitated by the groundwork it had laid, Peloton collaborated with music publishers to develop an innovative reproduction rights licensing framework that is appropriate for its business and reached agreements with all the "major" music publishers and many independent music publishers (as well as the performing rights organizations).

**B.     NMPA's Joint License Negotiations with Peloton**

33.     In an April 9, 2018 letter, NMPA first announced to Peloton its intention to collectively negotiate a licensing arrangement on behalf of an untold number of its member companies. While NMPA acknowledged in that letter that it was "encouraged" that Peloton had reached license agreements with many publishers, it accused Peloton of infringing uses of works owned at least in part by other unnamed NMPA members. The letter made clear that NMPA intended to negotiate on behalf of publishers to obtain "compensation for all past, present, and future uses of musical works."

34.     In light of NMPA's letter and NMPA's threats that it would turn many in the music publishing industry against Peloton if it did not engage with NMPA, Peloton felt it had little choice but to enter into negotiations with NMPA. Peloton and NMPA began discussing possible terms for Peloton to license, on a going-forward basis, the use of compositions controlled by NMPA members which had not yet entered into agreements with Peloton (as well as compensation, to the extent it might be applicable, for any prior uses of said publishers' works).

35.     One significant point of disagreement between NMPA and Peloton concerned NMPA's insistence on compensation for all its member publishers that had not previously entered into agreements with Peloton, regardless of whether Peloton had any desire to use songs controlled by every NMPA member publisher. Peloton explained to NMPA during negotiations that, unlike

music streaming services, Peloton does not need licenses to all or even most music to provide a compelling experience for Peloton users; and it was therefore unreasonable and uneconomical for Peloton to pay publishers whose works would never be used on Peloton's platform.

36.     Accordingly, Peloton asked NMPA on several occasions for a list of NMPA member publishers so that any negotiations could be tethered to those publishers whose works Peloton had an interest in using on its service. NMPA repeatedly refused to disclose the identities of its members—claiming it was somehow proprietary (this despite the existence of a non-disclosure agreement entered into by NMPA and Peloton that would have protected NMPA against any non-consensual disclosure). NMPA was obviously seeking to capitalize on this information asymmetry in its negotiations with Peloton.

37.     NMPA also demanded that Peloton deal only through NMPA and not with individual member publishers, except for those publishers with whom Peloton had previously been in discussions. Peloton felt it had no choice but to accede to the ground-rules laid out by NMPA, especially given NMPA's refusal to identify the publishers that it was purporting to represent in the negotiations.

38.     Over the course of months after receipt of NMPA's April 2018 letter, Peloton engaged in discussions with NMPA with the hope and expectation that NMPA would act constructively rather than anticompetitively. During these negotiations, NMPA, on behalf of the unnamed music publishers, exchanged with Peloton proposals and counter-proposals regarding contract terms (including prices for licenses).

39.     Peloton proceeded in good faith with such negotiations with NMPA throughout 2018, in part given NMPA's frequent acknowledgements that the parties were making progress,

and under the expectation that at some point soon NMPA would disclose the publishers who were considering Peloton's offer.

40.     Ultimately, however, Peloton learned that NMPA was not reciprocating in good faith. Upon information and belief, NMPA deliberately obfuscated to member publishers the substance of its discussions with Peloton, including by misrepresenting Peloton's positions during those negotiations. Among other things, upon information and belief, NMPA told its members that Peloton had withdrawn from the negotiations and was unwilling to further engage. This was untrue. It was NMPA which, without any explanation to Peloton, simply stopped responding to Peloton's attempts to negotiate in good faith in late 2018. As just one example, NMPA rejected Peloton's offer in late 2018 to travel to meet with NMPA in person at its offices in Washington, D.C.

41.     Another example of its bad faith was that NMPA used the negotiations to mine Peloton for information. Peloton entered into a non-disclosure agreement (NDA) with NMPA with the understanding that it would be used to facilitate negotiations between them. The NDA unequivocally stated that proprietary information shared pursuant to the NDA could be used only for "consideration internally of a business relationship or transaction between the parties, and its performance in any resulting arrangement, but not for any other purpose." On information and belief, NMPA later breached this NDA by disseminating and using proprietary information received from Peloton for a purpose very foreign to the notion of "consideration . . . of a business relationship." More specifically, NMPA used Peloton's information to interfere with individual publishers' ensuing negotiations with Peloton (described below) and to orchestrate the commencement of this lawsuit.

### C.    Peloton's Attempts to Directly Negotiate with Individual Publishers

42.    By January 2019, despite repeated outreaches from Peloton, NMPA had become increasingly non-responsive in the discussions with Peloton. Accordingly, Peloton then reached out individually to pursue licenses directly with several music publishers—including ole, Reservoir, Big Deal, Pulse, Round Hill and the Peer group of publishers—whose works Peloton desired to use on its service. Peloton also sought to continue a direct dialogue with Downtown, with whom it had been in discussions previously. But these Coordinating Publishers, after initially taking part in what appeared to be sincere negotiations, suddenly ceased communications with Peloton in a near-simultaneous and identical fashion in early 2019. This was the product of a concerted refusal to deal with Peloton instigated by NMPA and its leadership. The following negotiations exemplify the course of Peloton's attempted direct license negotiations.

*a.  Ole*

43.    Anthem, which was known as ole prior to June 2019, is a music publisher claiming to own an interest in many popular compositions. On or about January 4, 2019, Peloton engaged in negotiations with ole to discuss a potential license for copyrights controlled by ole.

44.    Ole had specifically expressed interest in discussing a direct license with Peloton. Peloton and ole engaged in extensive negotiations, as part of which Peloton offered to travel to ole's offices in Canada for an in-person meeting.

45.    License negotiations between Peloton and ole progressed to the point where, on February 1, 2019, Peloton sent term sheets and other offer materials to ole. Peloton also prepared and sent an NDA to ole to facilitate the negotiations.

46.    Then, in an abrupt change of course, ole stopped responding to Peloton's outreach. In the next correspondence from ole on February 11, 2019, ole stated that it had been communicating with NMPA and refused to sign the NDA.

33

47. Peloton's discussions with ole revealed that NMPA conveyed information to and coordinated with ole in February 2019 simultaneously with Peloton's efforts to finalize a direct license with ole.

48. On February 19, 2019, Peloton once again followed up and, during such communication, notified ole that Peloton had learned of a behind-the-scenes effort by NMPA to discourage direct individual publisher negotiations in favor of collective negotiations. Ole never denied NMPA's efforts.

49. Ole continued to refuse to engage with Peloton until the filing of this lawsuit in which ole was named as a plaintiff.

   b. *Reservoir*

50. Reservoir Media Management, Inc. is a music publisher claiming to own an interest in many popular compositions. In January 2019, Peloton contacted Reservoir to initiate negotiations for a direct license to utilize copyrights controlled by Reservoir. The parties exchanged several telephone calls and emails. Negotiations progressed to the point where the parties discussed specific terms of a license agreement; and on January 28, 2019, Peloton sent a term sheet and other offer materials to Reservoir.

51. On February 8, 2019, Peloton prepared and sent a draft NDA to facilitate the negotiations.

52. On February 14, 2019, Peloton sent a signed copy of the NDA to Reservoir for counter-signature. Reservoir, however, abruptly stopped responding to Peloton's communications and refused to sign the NDA.

53.     Peloton's discussions with Reservoir revealed that NMPA conveyed information to and coordinated with Reservoir in February 2019 simultaneously with Peloton's efforts to finalize a direct license with Reservoir.

54.     On February 19, 2019, Peloton once again followed up with Reservoir and, during such communication, notified Reservoir that Peloton had learned of a behind-the-scenes effort by NMPA to discourage direct individual publisher negotiations in favor of collective negotiations. Reservoir never denied NMPA's efforts.

55.     Peloton heard nothing further from Reservoir until the filing of this lawsuit.

      c.  *Downtown*

56.     Discussions between Peloton and Downtown started somewhat differently than the other Coordinating Publishers with whom Peloton was negotiating in early 2019—but they ended the same way. Peloton and Downtown had been in discussions independent of the Peloton-NMPA negotiations in 2018. Those discussions had progressed to a point where Peloton had provided data and proposed license terms to Downtown. But no agreement was reached by the end of 2018.

57.     In mid-January 2019, while it was engaged in separate direct negotiations with several other music publishers as described above, Peloton made a further proposal to Downtown with the hope of progressing negotiations. But Downtown abruptly went silent that month in its discussions with Peloton. It did not accept Peloton's proposal and, despite follow-up outreaches from Peloton, did not re-engage with Peloton. NMPA, meanwhile, conveyed information to and coordinated with Downtown simultaneously with Peloton's efforts in early 2019 to finalize a direct license with Downtown.

d.  *Other Publishers*

58.     Apart from ole, Reservoir, and Downtown, Peloton also reached out to and negotiated individually with several other Coordinating Publishers—and other music publishers—in early 2019.

59.     In the negotiations with other Coordinating Publishers, the same or very similar fact pattern emerged: negotiations progressed, proposed term sheets were prepared and sent, and then the publisher suddenly cut off negotiations, all around the same time. And like with ole, Reservoir, and Downtown, NMPA had conveyed information to and coordinated with these other Coordinating Publishers simultaneously with Peloton's efforts to finalize direct licenses with those publishers.

60.     Upon information and belief, NMPA instigated this collective refusal to deal by, among other means, misrepresenting the status of Peloton's engagement and negotiations with NMPA and providing and using information (and misinformation) in violation of the NDA it had signed with Peloton.

61.     As noted above, Peloton also engaged in individual negotiations in early 2019 with some additional music publishers. During this period between the time when discussions with NMPA broke down and the filing of this lawsuit, Peloton was able to reach agreements with certain music publishers who had initially been a part of the group NMPA had purportedly represented in the collective negotiations. NMPA placed significant pressure upon certain of these music publishers (as it did with the Coordinating Publishers) to cease direct individual discussions with Peloton and to collectively negotiate only through NMPA, which allowed these publishers to secure consideration from Peloton at a cost in excess of what Peloton would have otherwise had to incur but for NMPA's anticompetitive conduct and tortious interference.

## D.   NMPA as a Vehicle of Collusion

62.    Although they are horizontal competitors, the Coordinating Publishers, at the instigation of NMPA, have joined together to take advantage of the weight they collectively exert.

63.    The highly concentrated nature of the music publishing marketplace has enabled NMPA and the Coordinating Publishers to collude and to enforce such collusion.

64.    By NMPA's own acknowledgement, NMPA represents virtually the entire United States music publishing industry. NMPA is a trade association that has long served as a vehicle for coordination between and among publishers. Indeed, NMPA promotes its role in organizing collective negotiations as a member benefit in its marketing materials and public statements. NMPA's Israelite has also publicly stated that "we have negotiated numerous model agreements with online music service providers." And Billboard Magazine recently observed of a recent NMPA annual meeting that: "Like other speakers, Israelite urged the entire music industry to work together to 'expand the pie,' and not turn[] on one another to get a bigger piece of the pie."

65.    The Coordinating Publishers, as instigated by and through NMPA, have engaged in collective negotiations of license terms and have exchanged information with each other about ongoing license negotiations, including competitively sensitive information such as license terms, rates, and usage data.

66.    The Coordinating Publishers have many opportunities to meet and exchange such information at trade association meetings across the country, many of which are organized by NMPA. In the 12 months prior to the filing of the initial Complaint herein alone, NMPA organized the following events:

| Date | NMPA Event | Location |
|------|-----------|----------|
| February 6, 2019 | Grammy Week Songwriter Showcase | Los Angeles, CA |

| October 18, 2018 | Annual Gold & Platinum Gala | Nashville, TN |
| September 17, 2018 | DC Songwriter Reception | Washington, DC |
| September 17, 2018 | S.O.N.G.S. Foundation DC Golf Tournament | Washington, DC |
| June 13, 2018 | NMPA Annual Meeting | New York, NY |
| May 7, 2018 | S.O.N.G.S. Foundation LA Golf Tournament | Los Angeles, CA |
| February 6, 2018 | LA Songwriters Showcase | Los Angeles, CA |

67.     NMPA also organizes events that are invitation-only. Indeed, upon information and belief, NMPA organized separate "backroom" meetings involving the Coordinating Publishers, in furtherance of their collusion, that were held apart from the larger group of participants during NMPA events. These meetings excluded, at NMPA's direction, music publishers with whom Peloton had existing licenses.

### E.     NMPA's Continued Interference with Peloton's Business Relations

68.     The Harry Fox Agency ("HFA") is a rights-management agency that provides music publishing licensing and rights administration services, including through Rumblefish, its proprietary database. Michael Simon is the President and CEO of HFA, and President of Rumblefish. NMPA founded and owned HFA until October 2015, when SESAC—a performing rights organization—acquired HFA.

69.     HFA claims that it is "the gold-standard" in rights management, and that Rumblefish "remains the most trusted and reliable provider of administrative services and royalty administration for over fifty media and technology clients . . . ." HFA further claims that it "will

38

continue to provide the highest level of service to the industry" and that its "commitment to works matching, licensing, royalty collection and distribution has never wavered."

70.     On July 24, 2018, Peloton and HFA executed a mutual non-disclosure agreement ("NDA") that contemplated that HFA would provide data services to Peloton, and, in January 2019, Peloton and HFA began to formally discuss specific data services in connection with the Peloton platform.

71.     On February 1, 2019, HFA d/b/a Rumblefish simultaneously executed an amendment to the terms of the NDA and entered into an Administration Services Agreement with Peloton to provide two separate data deliverables. Under the terms of this agreement, HFA agreed that it would: (1) assist Peloton with identifying musical works embodied in certain sound recording data, and provide U.S. publisher information and ownership shares associated with the identified musical works; and (2) assist Peloton with identifying musical works that have been licensed 100% under direct worldwide synchronization licensing agreements between Peloton and numerous publishers on a catalog-wide basis in connection with Peloton's platform.

72.     Specifically, HFA agreed to deliver a report of data relating to sound recordings identified by Peloton, including the title of the musical work, the writer name(s), the associated unique Rumblefish identifier for each musical work, and each publisher(s) name and respective ownership shares for each musical work embodied in such sound recordings. On February 5, 2019, Peloton uploaded a request file and provided written notification to HFA. HFA provided to Peloton a deliverable in response on February 19, 2019.

73.     Under the terms of the February 1 agreement, HFA also agreed to provide a report that would indicate with a flag those sound recordings embodying an underlying musical work that HFA believed to be licensed 100% under Peloton's direct licensing agreements with publishers.

On February 5, 2019, Peloton uploaded a request file of titles and provided written notification to HFA. HFA provided to Peloton two deliverables in response, one on February 25, 2019 and the other on March 7, 2019.

74. On March 27, 2019, HFA d/b/a Rumblefish entered into a second Administration Services Agreement with Peloton. Under the terms of this agreement, HFA agreed to assist Peloton with identifying musical works that have been licensed 100% under Peloton's direct licensing agreements with specified music publishers, both on a catalog-wide and song-by-song basis. On March 26, 2019, Peloton uploaded its request file and provided written notification to HFA. HFA provided to Peloton a deliverable in response on March 29, 2019.

75. On April 18, 2019, Peloton and HFA further agreed that HFA would provide an additional data deliverable. Specifically, HFA agreed that it would process another request file of approximately 100,000 titles to determine if they were licensed 100% under Peloton's direct licensing agreements. On April 22, 2019, Peloton uploaded its request file and provided written notification to HFA. HFA provided to Peloton a deliverable in response on May 2, 2019.

76. During May 2019, Peloton and HFA engaged in extensive discussions concerning additional services to be provided by HFA, including routine update reports. On or about May 16, 2019, Peloton sent HFA an email setting forth the terms of the contemplated services. HFA responded on May 20, 2019, stating that HFA President/CEO Michael Simon was out of the office but that HFA would review and "get back" to Peloton later that week.

77. However, after the May 20 email, HFA suddenly and inexplicably ceased all communications with Peloton. Peloton reached out to HFA repeatedly on May 28, 2019, May 30, 2019, and June 3, 2019 to seek an explanation but received no response.

78.     On or about June 4, 2019, Mr. Simon called Peloton, stating that HFA was under "a ton of pressure, not just from D.C. but also from New York"—meaning NMPA and other members of the publishing industry affiliated with NMPA—to stop working with Peloton. Simon further stated that, as a result of this "ton of pressure," he had directed the Rumblefish team to not engage with Peloton, and that he understood that there would "be many more compositions and plaintiffs coming into the lawsuit."

79.     Upon information and belief, NMPA deliberately interfered with HFA's work with Peloton to impede Peloton's efforts to ensure that all of the musical works embodied in Peloton videos were subject to Peloton's direct licenses with publishers on a 100% basis, i.e., covering interests of all co-owners of such musical works.

80.     Peloton later discovered that HFA also had provided faulty data in its data deliverables between February 2019 and May 2019, insofar as it provided inaccurate information about the ownership of some musical works.

**F.     The Relevant Market**

81.     The relevant product market is reproduction rights licenses to the copyrighted works controlled (in whole or in part) and collectively negotiated by the Coordinating Publishers through NMPA (the "collectively negotiated copyrights").

82.     Reproduction rights licenses from other publishers would not provide the copyrights necessary for music users to use such works and are thus not reasonably interchangeable with those collectively negotiated by NMPA and its members. If a NMPA member holds any interest, even a partial or fractional interest, in a copyrighted work, a music user may need to obtain a license from that party for the work or otherwise face potential liability for

copyright infringement. Other licenses would not substitute for the collectively negotiated copyrights.

83.     The relevant geographic market is the United States. NMPA members do not limit their licenses to the collectively negotiated copyrights to any one part of the country, but they sell licenses to Peloton and to other music users all over the United States.

## Anticompetitive Behavior

84.     NMPA and Coordinating Publishers have entered into unlawful agreements in restraint of trade to obtain higher payments for the collectively negotiated copyrights.

### A.     Collective Negotiations and Concerted Refusal to Deal Artificially Restrain Competition

85.     Individual publishers are horizontal competitors within the meaning of the antitrust laws. But for their agreements, the Coordinating Publishers would individually negotiate licenses of rights to their musical works to music users like Peloton.

86.     NMPA and the Coordinating Publishers have agreed to aggregate and jointly negotiate licenses providing access to the copyrighted works controlled by the Coordinating Publishers, thus eliminating price competition among and between Coordinating Publishers.

87.     By agreeing to make NMPA the designated negotiator of their copyrights and engaging in the conduct described above, including both efforts to fix prices for the collectively negotiated copyrights and then engaging in a group boycott, NMPA and the Coordinating Publishers have agreed to make it either impossible or, at a minimum, uneconomical for Peloton to negotiate direct licenses.

88.     Other than to limit competition, it is against the economic self-interest of the Coordinating Publishers to refuse to offer to prospective licensees access to their musical works other than through an NMPA-negotiated collective license.

89.     Absent a common understanding, the Coordinating Publishers' economic self-interest would lead them to maintain maximum flexibility to negotiate the best possible license fee for their own works, including the ability to negotiate direct licenses with individual music users like Peloton.

90.     When coordinating through NMPA, the Coordinating Publishers share a common understanding that they will refrain from competing with each other for access to the copyrights they control. By joining forces, the Coordinating Publishers seek to enjoy supracompetitive prices for their licenses.

91.     By colluding with one another, NMPA and the Coordinating Publishers are acting as a cartel, such that (i) any collectively negotiated payments amount to a form of price fixing between horizontal competitors, and (ii) their concerted refusal to deal with Peloton amounts to a group boycott. Upon information and belief, NMPA is continuing to exert pressure on additional music publishers that are not party to this action in order to expand the existing cartel.

## B.     Lack of Procompetitive Justification

92.     NMPA and the Coordinating Publishers' collective negotiations do not offer procompetitive benefits outweighing the competitive harms. There is no inability on the part of individual publishers, whatever their size, to engage in direct individual negotiations with Peloton and other users. NMPA admitted as much in its public comments submitted to the Department of Justice lobbying for a repeal of the ASCAP/BMI consent decrees. It argued that "even small publishers, with adequate technology, can efficiently engage in direct licensing . . . ."

93.     NMPA's insistence on negotiating for the benefit of an aggregation of music publishers, regardless of whether Peloton had any desire to use the compositions controlled by publishers that were part of that aggregation, drains the collective negotiations of any supposed efficiencies. Unlike with music streaming services, the nature of Peloton's use of music does not

require that it have access to the tens of millions of tracks that are typical of on-demand digital music service offerings. NMPA nevertheless was effectively demanding Peloton to commit to pay for content that Peloton had no interest in using.

94.     Further, a significant percentage of the collectively negotiated copyrights are only offered as fractional licenses, meaning that a licensee cannot use that music without obtaining additional licenses from other co-owners of those works. In other words, even negotiating a license to the collectively negotiated copyrights would not protect a licensee from the risk of copyright infringement where the Coordinating Publishers do not control 100% interests in the relevant works.

95.     In fact, upon information and belief, only about 10% of the compositions identified in the Complaint are 100% controlled by a single Coordinating Publisher; and even considering the interests of all the Coordinating Publishers in the aggregate, only an additional 2% (or a total of approximately 12%) of the compositions identified in the Complaint are 100% controlled by the Coordinating Publishers as a group.

96.     NMPA and the Coordinating Publishers' conduct has not otherwise improved the quality or quantity of reproduction rights available to music users.

97.     The type of collective licensing offered by NMPA falls far short of the only type of collective licensing of music rights that the Supreme Court has ever permitted. The Supreme Court allowed collective licensing through ASCAP and BMI to survive antitrust challenge, albeit subject to consent decree protections for licensees, only because their licenses purported to provide "unplanned, rapid, and indemnified access" to the works in those collectives' repertories. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979). But NMPA does not offer such ready indemnified access to the collectively negotiated copyrights, because the licensee must still

secure reproduction rights from any other co-owners of those works. Nor are NMPA's collective acts subject to the types of regulatory safeguards (e.g., effective compulsory licensing and judicial rate oversight) provided by the ASCAP and BMI consent decrees.

98.     As a result, NMPA and the Coordinating Publishers' collective licensing activities do not outweigh the resulting competitive harms.

### **Competitive Harm**

99.     The purpose and effect of the anticompetitive behavior described above has been to force music users, such as Peloton, to pay supracompetitive prices for licenses to the collectively negotiated copyrights and/or to be foreclosed from the licensing of the collectively negotiated copyrights.

100.     By virtue of their anticompetitive conduct, NMPA and the Coordinating Publishers seek to obtain payments for licenses for the collectively negotiated copyrights that are much higher than would otherwise be possible absent their collusion.

101.     The conduct has also had a chilling effect on the licensing marketplace by artificially limiting Peloton's ability to secure direct licenses from other music publishers in the United States and abroad on competitive terms. Despite Peloton's continued efforts to seek licenses from music publishers that are not party to this lawsuit, the conduct of NMPA and the Coordinating Publishers has led some of those publishers to refrain from engaging in discussions with Peloton. Furthermore, licensors who were previously in productive discussions with Peloton are now seeking to use the coordinated conduct of the Counterclaim Defendants as a means to extract additional compensation.

**Antitrust Injury**

102.     Peloton has suffered and will continue to suffer injury of the type that the antitrust laws were intended to prevent and that directly results from NMPA and the Coordinating Publishers' unlawful conduct described above.

103.     Because the Coordinating Publishers banded together to leverage their copyrights, Peloton has faced distorted license negotiations and has had to pay supracompetitive prices for certain rights. In addition, the anticompetitive conduct described above has limited the supply of direct licenses. Further, Peloton also has suffered harm to its reputation and goodwill built through years of investments. Peloton will continue to face the same anticompetitive scenario in the future and brings the present action to seek redress for the unlawful behavior of NMPA and the Coordinating Publishers.

**COUNT I**
**UNLAWFUL AGREEMENTS IN RESTRAINT OF TRADE**
**IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(ALL COUNTERCLAIM DEFENDANTS)**

104.     Peloton incorporates by reference the allegations set forth in Paragraphs 1 through 103 as though repeated and realleged here in full.

105.     As early as 2018, and continuing to the present, the exact dates being unknown to Peloton, NMPA and the Coordinating Publishers entered into a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

106.     The anticompetitive acts were intentionally directed at the United States and had a substantial and foreseeable effect on interstate commerce by artificially raising and fixing prices for the collectively negotiated copyrights throughout the United States.

107.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, NMPA and the Coordinating Publishers did those things that they agreed and conspired to do, including: (i) agreeing to license only on the basis of a common price for the collectively negotiated copyrights; and (ii) entering into a concerted refusal to deal with Peloton, except through licenses collectively negotiated by NMPA.

108.    Because of the unlawful conduct of NMPA and the Coordinating Publishers, Peloton has been harmed by being forced to make artificially inflated, supracompetitive payments to music publishers. The conspiracy has had the following effects, among others:

        *a.*    Price competition for the collectively negotiated copyrights has been restrained, suppressed, and/or eliminated in the United States;

        *b.*    Prices for the collectively negotiated copyrights have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

        *c.*    Peloton has been deprived of the benefits of free and open competition.

109.    Peloton has been injured and will continue to be injured in its business and property by having to pay more for copyrights than it would have to pay in the absence of a conspiracy. Peloton has also experienced reputational harm, loss of goodwill, and diminished supply of direct licenses due to the anticompetitive conduct of NMPA and the Coordinating Publishers.

110.    As a direct and proximate result of the unlawful conduct of NMPA and the Coordinating Publishers in furtherance of the violations alleged, Peloton has been injured in its business and property in an amount to be proved at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

111.    Peloton is also entitled to recover from NMPA and the Coordinating Publishers the cost of suit, including its reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

112.    Peloton will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins NMPA and the Coordinating Publishers from their unlawful conduct and continuing violations of the antitrust laws. An injunction is thus necessary to remedy the continuing violation.

## COUNT II
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS IN VIOLATION OF NEW YORK STATE LAW
### (NMPA)

113.    Peloton incorporates by reference the allegations set forth in Paragraphs 1 through 103 as though repeated and realleged here in full.

114.    Peloton enjoyed business relations with music publishers and had a reasonable expectancy of future business relationships for the licensing of copyrights. Peloton engaged in individual negotiations with music publishers for such licenses.

115.    As explained in detail above, music publishers were prepared to negotiate and issue licenses to Peloton up until the time of NMPA's ringleading efforts to coordinate a concerted refusal to deal with Peloton. At all relevant times, NMPA had actual knowledge of these business relationships and knew that these relationships constituted valuable business for Peloton.

116.    NMPA interfered with the ongoing negotiations between Peloton and music publishers by encouraging them to cease discussions of direct licenses and to collectively negotiate licenses instead.

117.    NMPA acted with the purpose of harming Peloton, and by using dishonest, unfair, and improper means to do so, including, but not limited to: its anticompetitive collusion described above; its provision and use of information (and misinformation) to Coordinating Publishers in

violation of the NMPA-Peloton NDA; and by making misrepresentations (about Peloton and its prior negotiations with NMPA) to individual publishers with whom Peloton was negotiating. NMPA did so with the purpose of disrupting Peloton's negotiations with such publishers. NMPA's explicit and malicious intent to harm Peloton is further illustrated by its actions interfering with the Harry Fox Agency's work for Peloton.

118.   As a direct and proximate result of NMPA's wrongful conduct, music publishers ceased negotiations with Peloton. Peloton has experienced injuries to its business and investments as a consequence thereof.

119.   NMPA has acted willfully, maliciously, oppressively, with full knowledge of the adverse effects of its actions on Peloton, with willful and deliberate disregard of the consequences to Peloton, and with specific intent. Accordingly, Peloton seeks exemplary and punitive damages pursuant to New York law.

120.   Peloton is entitled to recover from NMPA the cost of suit, including its reasonable attorneys' fees, pursuant to New York law because NMPA has acted in bad faith, has been stubbornly litigious and/or has caused Peloton unnecessary trouble and expense.

121.   Peloton will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court permanently enjoins NMPA from its tortious conduct. Peloton is thus entitled to injunctive relief against NMPA.

## **Relief Sought**

WHEREFORE Peloton respectfully requests that the Court enter judgment and grant relief as follows:

122.   Adjudge Counterclaim Defendants to have violated and to be in continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

123.    Adjudge NMPA to have tortiously interfered with Peloton's prospective business relations in continuing violation of the common law of the State of New York.

124.    Enter judgment for Peloton for three times the amount of damages sustained by Peloton due to Counterclaim Defendants' violations of the federal antitrust laws, together with the expenses of litigation and cost of this action, including its reasonable attorneys' fees, and such other relief as appropriate.

125.    Enter judgment for Peloton against NMPA for actual and punitive damages attributable to its intentional and tortious misconduct.

126.    Grant Peloton pre- and post-judgment interest under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

127.    Pursuant to Federal Rule of Civil Procedure 65, enjoin Counterclaim Defendants from engaging in further anticompetitive and unlawful conduct, including without limitation by: (i) enjoining Counterclaim Defendants from collectively negotiating with music users; and (ii) enjoining NMPA from otherwise interfering in music publishers' negotiations with Peloton and other music users.

128.    Grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and to prevent recurrence of Counterclaim Defendants' unlawful conduct.

Dated: October 11, 2019
New York, New York

KING & SPALDING LLP

/s/ Kenneth L. Steinthal
Kenneth L. Steinthal
101 Second Street, Suite 2300
San Francisco, CA 94105
Phone: (415) 318-1200
Fax: (415) 318-1300
ksteinthal@kslaw.com

J. Blake Cunningham (*pro hac vice*)
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
Phone: (512) 457-2000
Fax: (512) 457-2100
bcunningham@kslaw.com

Christopher C. Yook (*pro hac vice*)
David P. Mattern (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, Suite 200
Washington, DC 20006
Phone: (202) 737-0500
Fax: (202) 626-3737
cyook@kslaw.com
dmattern@kslaw.com

Emily T. Chen
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2100
Fax: (212) 556-2222
echen@kslaw.com

*Attorneys for Defendant-Counterclaim
Plaintiff Peloton Interactive, Inc.*