UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOWNTOWN MUSIC PUBLISHING LLC, OLE MEDIA MANAGEMENT, L.P., BIG DEAL MUSIC, LLC, CYPMP, LLC, PEER INTERNATIONAL CORPORATION, PSO LIMITED, PEERMUSIC LTD., PEERMUSIC III, LTD., PEERTUNES, LTD., SONGS OF PEER LTD., RESERVOIR MEDIA MANAGEMENT, INC., THE RICHMOND ORGANIZATION, INC., DEVON MUSIC, INC., ESSEX MUSIC, INC., ESSEX MUSIC INTERNATIONAL, INC., FOLKWAYS MUSIC PUBLISHERS, INC., HAMPSHIRE HOUSE PUBLISHING CORP., HOLLIS MUSIC, INC., LUDLOW MUSIC, INC., MELODY TRAILS, INC., MUSICAL COMEDY PRODUCTIONS, INC., PALM VALLEY MUSIC, LLC, WORDS & MUSIC, INC., ROUND HILL MUSIC LLC, ROUND HILL MUSIC LP, THE ROYALTY NETWORK, INC., and ULTRA INTERNATIONAL MUSIC PUBLISHING, LLC,

*Plaintiffs and Counterclaim Defendants, and*

GREENSLEEVES PUBLISHING LIMITED, ME GUSTA MUSIC, LLC, STB MUSIC, INC., and TUNECORE, INC.,

*Plaintiffs, and*

NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC.,

*Counterclaim Defendant,*

v.

PELOTON INTERACTIVE, INC.,

*Defendant and Counterclaim Plaintiff.*

No. 19-cv-02426 (DLC)

**ORAL ARGUMENT REQUESTED**

**COUNTERCLAIM DEFENDANTS' REPLY MEMORANDUM
OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS DEFENDANT-
COUNTERCLAIM PLAINTIFF'S COUNTERCLAIMS**

                                                      PAUL, WEISS, RIFKIND,
                                                      WHARTON & GARRISON LLP
                                                      1285 Avenue of the Americas
                                                      New York, New York 10019-6064
                                                      Tel.: (212) 373-3000
                                                      Fax: (212) 757-3990

                                                      *Attorneys for Counterclaim Defendants*

Dated: November 15, 2019

# **TABLE OF CONTENTS**

Page

Table of Authorities .................................................................................................................ii
Preliminary Statement ............................................................................................................. 1
Argument ................................................................................................................................. 1
I. PELOTON FAILS TO ALLEGE A CONSPIRACY TO BOYCOTT OR AN
    ANTICOMPETITIVE COLLECTIVE LICENSING AGREEMENT ................... 1
   A.    Peloton's Antitrust Counterclaim Is Barred by *Noerr-Pennington* Immunity .. 1
   B.    Peloton Fails Adequately to Allege a Conspiracy under *Twombly* .................. 3
   C.    Peloton Has Failed to Plead a Rule of Reason Case ......................................... 5
II. PELOTON FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH
    PROSPECTIVE BUSINESS RELATIONS ........................................................... 7
Conclusion ............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alexander Interactive, Inc.* v. *Leisure Pro Ltd.*,
  No. 14-CV-2796, 2014 WL 4651942 (S.D.N.Y. Sept. 16, 2014) ............................... 8

*In re American Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 3d 324 (E.D.N.Y. 2019) ........................................................................ 6

*American Needle, Inc.* v. *National Football League*,
  560 U.S. 183 (2010) .................................................................................................... 6

*U.S.* v. *Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) .................................................................................. 5, 6

*Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*,
  356 F. Supp. 3d 379 (S.D.N.Y. 2019) ...................................................................... 10

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 3

*Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ........................................................................................................ 5

*Carvel Corp.* v. *Noonan*,
  3 N.Y.3d 182 (N.Y. 2004) .......................................................................................... 8

*Clean Coal Techs., Inc.* v. *Leidos, Inc.*,
  377 F. Supp. 3d 303 (S.D.N.Y. 2019) ........................................................................ 8

*Concord Assocs., L.P.* v. *Entm't Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016) ......................................................................................... 6

*Conn. Fine Wines and Spirits, LLC* v. *Seagull*,
  932 F.3d 22 (2d Cir. 2019) ......................................................................................... 3

*Friedman* v. *Coldwater Creek, Inc.*,
  321 F. App'x 58 (2d Cir. 2009) .................................................................................. 8

*Guzik* v. *Albright*,
  No. 16-CV-2257, 2018 WL 4386084 (S.D.N.Y. Sept. 14, 2018) ............................. 10

*FTC* v. *Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) .................................................................................................... 3

*Major League Baseball Props.* v. *Salvino, Inc.*,
 542 F.3d 290 (2d Cir. 2008) .................................................................................. 6

*Mayor and City Council of Baltimore, Md.* v. *Citigroup, Inc.*,
 709 F.3d 129 (2d Cir. 2013) .................................................................................. 3

*Meredith Corp.* v. *SESAC, LLC*,
 No. 09-CV-9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ................................. 5

*Meredith Corp.* v. *SESAC*,
 1 F. Supp. 3d 180 (S.D.N.Y. 2014) ........................................................................ 7

*PrimeTime 24 Joint Venture* v. *National Broadcasting Co.*,
 219 F.3d 92 (2d Cir. 2000) ................................................................................ 2, 3

*Ramsay-Nobles* v. *Keyser*,
 No. 16 Civ. 5778, 2018 WL 6985228, (S.D.N.Y. December 18, 2018) .................. 9

*River Light V, L.P.* v. *Lin & J Int'l, Inc.*,
 No. 13 Civ. 3669, 2014 WL 2861480, (S.D.N.Y. June 24, 2014) ............................ 9

*Sidney Frank Importing Co.* v. *Beam Inc.*,
 998 F. Supp. 2d 193 (S.D.N.Y. 2014) .................................................................... 8

*Sorias* v. *Nat'l Cellular USA, Inc.*,
 124 F. Supp. 3d 244 (E.D.N.Y. 2015) .................................................................... 8

*Spinelli* v. *National Football League*,
 903 F.3d 185 (2d Cir. 2018) .................................................................................. 6

*New York ex rel. Spitzer* v. *Saint Francis Hosp.*,
 94 F. Supp. 2d 399 (S.D.N.Y. 2000) ...................................................................... 6

*Tanaka* v. *University of Southern California*,
 252 F.3d 1059 (9th Cir. 2001) ............................................................................... 7

*Todd* v. *Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) .................................................................................. 6

*Union Carbide Corp.* v. *Montell N.V.*,
 944 F. Supp. 1119 (S.D.N.Y. 1996) ..................................................................... 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 10

**PRELIMINARY STATEMENT**

Peloton's opposition to Counterclaim Defendants' motion to dismiss ("Opp.") does nothing to remedy the core defects of its antitrust and tortious interference counterclaims, which remain a fruitless attempt to deflect attention from Peloton's years of willful copyright infringement.

Peloton's antitrust claim is clearly barred by the *Noerr-Pennington* doctrine. To the extent that Peloton alleges a "group boycott" or "refusal to deal" by the Publishers and NMPA, it has not plausibly pled such a conspiracy under *Twombly*. To the contrary: the facts as pled *by Peloton* demonstrate that the Publishers, through their trade association, sought to act together only to enforce their ownership rights to copyrights that Peloton had already violated for years and would have continued to violate had NMPA not called out Peloton's infringement by sending a cease-and-desist letter in April of 2018. And Peloton's tort claim against NMPA also fails as a matter of law because NMPA's conduct did not constitute the wrongful means required to uphold such a claim and Peloton does not plead sufficient facts to show that it would have entered into synchronization (or "sync") licenses with music publishers "but for" NMPA's conduct.

**ARGUMENT**

**I. PELOTON FAILS TO ALLEGE A CONSPIRACY TO BOYCOTT OR AN ANTICOMPETITIVE COLLECTIVE LICENSING AGREEMENT**

    **A. Peloton's Antitrust Counterclaim Is Barred by *Noerr-Pennington* Immunity**

There can be no question that the actions taken by the Publishers and NMPA to cease Peloton's infringement of Publishers' copyrights are protected by *Noerr-Pennington* immunity. (*See* Counterclaim Defendants' Opening Brief ("Opening Br."), at 7–10.) As Peloton recognizes, NMPA first contacted it in April 2018 to address "the problem of widespread music copyright infringement on [the] Peloton [Platform]" and "to enforce the rights of" NMPA's member publishers, "who own and/or administer musical copyrights infringed by Peloton." (New

1

Countercl. ¶¶ 33–34; Beale Decl., Exhibit 1 (Apr. 9, 2018 Letter from J. Cohen to H. Kushi).) NMPA described Peloton's unauthorized use of musical works, offered to "engage in a dialogue concerning a negotiated resolution to" the identified infringement, and demanded that Peloton "immediately cease use of unlicensed copyrighted music." (Beale Decl., Exhibit 1.) That the April 2018 letter went on to state that NMPA sought to obtain, on behalf of its members, "compensation for all past, present, and future uses of works,'" (Beale Decl., Exhibit 1), does not change the fact that NMPA acted for the purpose of protecting the intellectual property of its members (including the Publishers). The fact that NMPA and the Publishers' efforts to negotiate a resolution without litigation proved fruitless, and eventually resulted in the filing of this copyright infringement action (New Countercl. ¶¶ 33–39, 42–61), cannot transform this intellectual property dispute into a "refusal to deal" antitrust conspiracy engineered by NMPA. Nor can Peloton support such a claim by pleading that its belated efforts in early 2019 to license a fraction of the Publishers failed (*id*. ¶ 42); the decision by those Publishers to pursue their legal remedy for Peloton's years-long unlicensed use of their copyrighted musical compositions does not take their conduct outside of *Noerr-Pennington.*

Peloton's contrary argument is premised on its misreading of the Second Circuit's decision in *PrimeTime 24 Joint Venture* v. *National Broadcasting Co.*, 219 F.3d 92 (2d Cir. 2000). PrimeTime prevailed in showing that the broadcasters engaged in a "'pattern of baseless, repetitive' signal strength challenges" under the Satellite Home Viewer Act that constituted a "sham"—an exception to *Noerr-Pennington* immunity. 219 F.3d at 102. But Peloton concedes that the Publishers' joint filing here was not a sham. (Opp. at 9–10.) Nor does this case, unlike *PrimeTime*, involve efforts to block an emerging competitor from entering the market. Peloton does not compete with the Publishers. "Boycotts," as a category in antitrust cases, are limited to concerted refusals to deal targeted against *competitors*. *FTC* v. *Ind. Fed'n of Dentists*, 476 U.S.

2

447, 458 (1986).  Finally, and perhaps most significantly, the broadcasters' trade association instructed its members not to deal with PrimeTime.  *Primetime 24*, 219 F.3d at 102.  Here, by contrast, NMPA in fact *initiated* the negotiations to remedy Peloton's ongoing copyright infringement.

### B.   Peloton Fails Adequately to Allege a Conspiracy under *Twombly*

Our opening brief showed that Peloton's counterclaim failed to allege a concerted boycott agreement under the requirements of *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007).  Peloton's response is entirely ineffective, continuously confusing two distinct antitrust concepts—employment of a common agent to conduct copyright licensing and a "concerted refusal to deal." (*E.g.*, Opp. at 10 (complaining that Publishers "negotiate[d] collectively"), 11 ("concerted refusal to deal").)  Peloton clearly has not alleged the latter sufficiently under *Twombly*.

The "evidence" of conspiracy to boycott on which Peloton relies is that some of the Publishers allegedly cut off their licensing discussions with Peloton at about the same time shortly before they jointly sued Peloton in this lawsuit.  (Opp. at 14.)  Peloton's obligation "is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor and City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Where "the complaint itself gives reasons to believe" that the challenged action could just as readily have been the product of independent decision-making as collusion or there are "natural explanations" for the defendants' parallel conduct other than collusion, the complaint is subject to dismissal for failure adequately to allege a collusive agreement.  *Twombly,* 550 U.S. at 568; *Conn. Fine Wines and Spirits, LLC* v. *Seagull*, 932 F.3d 22 38–39 (2d Cir. 2019).

Peloton's counterclaim provides an entirely "natural" reason why the Publishers would have discontinued their negotiations with Peloton at about the same time in about the same way—they had each decided to participate in a lawsuit against Peloton to enforce their rights.  Such

3

an alleged agreement followed Peloton's half-hearted and belated attempts to directly negotiate licenses with just six of the fourteen Publisher plaintiffs, negotiations that Peloton did not initiate until well after it had been exposed as a copyright infringer by NMPA's April 2018 cease-and-desist letter. (New Countercl. ¶¶ 42–61.) Peloton's conclusory assertion that, absent an agreement to boycott Peloton, it would have been in each Publisher's individual interest to license Peloton (*see* Opp. at 11), notwithstanding Peloton's longstanding infringement of Publishers' music works, is nothing more than rank speculation. If a publisher understood that Peloton was a willful copyright infringer—which it is—it would be entirely rational for that publisher to decline to engage in licensing negotiations until Peloton's liability for those violations was resolved.

Peloton's own allegations provide further logical reasons why the few Publishers that Peloton approached would have ceased negotiations. (Opening Br., at 13–15.) Peloton alleges that NMPA misrepresented the status of its discussions with Peloton, falsely telling the Publishers that Peloton had withdrawn from negotiations (New Countercl. ¶¶ 40, 6); if each of the Publishers had been informed that Peloton had withdrawn from negotiations, there would be a "natural explanation" for why they would have stopped trying to negotiate with Peloton and instead pressed forward with the lawsuit. By alleging facts that provide a "natural explanation" for the Publishers' withdrawal from licensing negotiations, Peloton has shot its own case in the foot.[1]

Without any allegations of fact sufficient to raise an inference of a concerted agreement to boycott Peloton, Peloton's assertions regarding the concentrated market structure, "interfirm communications," and participation in trade associations go nowhere. As set forth in

---

[1] Peloton mistakenly seizes on a footnote in the opening brief (Opp. at 15 (citing Opening Br., at 14 n.5)) to argue that the alleged misrepresentations by NMPA have no bearing on the antitrust question as an abandonment of this argument. The footnote provides no such support. The point of the footnote was that, even if NMPA had misrepresented the status of negotiations, that misrepresentation would not create *antitrust* liability. The allegation is still quite relevant to the instant question—whether Peloton has adequately alleged a conspiracy.

4

the moving brief, such allegations alone cannot establish conspiracy. (Opening Br., at 11, 14–15 (citing *United States* v. *Apple*, 791 F.3d 290, 315 (2d Cir. 2015)).)

        **C.**      **Peloton Has Failed to Plead a Rule of Reason Case**

Peloton's antitrust claims are subject to rule of reason rather than *per se* analysis. *Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.* (*BMI*), 441 U.S. 1 (1979). (Opening Br., at 16–18.) Peloton seeks to distinguish *BMI* as a case where the rights holders' conduct was subject to a consent decree that made licensing compulsory. *BMI*'s adoption of rule of reason analysis for joint licensing of copyrighted music, however, is not limited to circumstances governed by a consent decree or compulsory licensing. *Meredith Corp.* v. *SESAC, LLC*, No. 09-CV-9177, 2011 WL 856266, at *11 (S.D.N.Y. Mar. 9, 2011) ("While the Supreme Court certainly considered the role of ASCAP and BMI's consent decrees when determining that the blanket license should be judged under the rule of reason standard, its holding that the blanket license 'should [not] automatically be declared illegal in all of its many manifestations' requires that SESAC's blanket license—a different 'manifestation' of the blanket license—should be subject to the more discriminating analysis of the rule of reason.") (quoting *BMI*, 441 U.S. at 24). Peloton also argues that, unlike in *BMI*, the uniform licensing terms NMPA sought to negotiate were not a "different product" from individual licenses the Publishers could have offered themselves. The holding in *BMI* did not turn on the fact that the performing rights organizations ("PROs") offered a "different product"; rather, it was rooted in the Court's narrow application of the *per se* doctrine and the efficiencies created by collective licensing. 441 U.S at 19–21. Peloton's argument also ignores the Supreme Court's admonition that the antitrust laws must be read in harmony with the rights granted in the Copyright Act. *Id.* at 19 ("Although the copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise violate the antitrust laws, we would not expect that any market arrangements reasonably necessary to effectuate the rights that are granted would

be deemed a *per se* violation of the Sherman Act."). Contrary to Peloton's position, it is well-established that joint licensing of intellectual property is not *per se* illegal.[2] *Spinelli* v. *National Football League*, 903 F.3d 185, 211–12 (2d Cir. 2018) (applying rule of reason to decision by individual NFL teams to license their intellectual property jointly); *American Needle, Inc.* v. *National Football League*, 560 U.S. 183, 203 (2010) (appointment of joint agent to license intellectual property rights for 32 separate NFL teams subject to rule of reason analysis); *Major League Baseball Props.* v. *Salvino, Inc.*, 542 F.3d 290, 334 (2d Cir. 2008) (appointment of single firm as exclusive licensing agent for intellectual property of baseball teams not subject to *per se* analysis).

In order to state a rule of reason case under Section 1 of the Sherman Act, Peloton would have to plead a properly defined relevant market.[3] (*See* Opening Br., at 16–18.) Here, the alleged relevant market—consisting solely of the sync rights in the repertory of the "Coordinating Publishers"—is not a proper market because there is no allegation that the rights controlled by the "Coordinating Publishers" are not substitutable with the rights to musical works controlled by other publishers not a party to this lawsuit (such as third-party publishers from whom Peloton has admitted obtaining licenses). (*Id.*) Peloton has gerrymandered the market definition to encompass just the works controlled by the Publishers, which is contrary to relevant law. *See In re American Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343–44 (E.D.N.Y. 2019) (collecting cases disfavoring definition of "single brand" relevant markets).

---

[2] Peloton cites two cases that do not remotely stand for the proposition that joint copyright licensing is *per se* illegal. *U.S.* v. *Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) involved a naked agreement among book publishers to fix the prices of e-books they sold through third-party online retailers. Similarly, in *New York ex rel. Spitzer* v. *Saint Francis Hosp.*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000), "defendants [] fixed prices by jointly agreeing on the terms and rates they [] charge[d] for many of the services they provide[d]." *Id.* at 413–15. By contrast, an agreement to license intellectual property through a common agent, which Peloton alleges here, is not *per se* illegal.

[3] "[T]here is 'no absolute rule' against dismissal" on this ground at the motion to dismiss stage and "in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiff['s] complaint asserts sufficient facts to allege plausibly the existence of" a product market. *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (citing *Todd* v. *Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)).

Peloton recognizes that it cannot fit within *Meredith Corp.* v. *SESAC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014), where the court allowed a relevant market to be defined in the repertory of a PRO because all television stations needed access to the entire music repertory of each PRO. Peloton asserts that it "does not require licenses to all musical compositions, or even to all those compositions controlled (in whole or in part) by the coordinating publishers[,]" but that "information transparency problems" render "it challenging, if not effectively impossible, to entirely avoid works that are at least fractionally within the counterclaim defendants' repertories." (Opp. at 18–19.) This assertion cannot solve the fundamental problem with Peloton's gerrymandered market definition. Peloton admits that the sync market does *not* require access to all compositions in any particular Publisher's repertory. (New Countercl. ¶ 30.) That the reality of how a sync market operates is inconvenient to Peloton in light of its business model does not change antitrust law's requirements of relevant market definition—relevant markets are defined based on the general economic properties of the market, not a party's convenience or subjective preferences. *See Tanaka* v. *University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001).[4]

## II. PELOTON FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

Peloton fails to state a claim against NMPA for tortious interference with prospective business relations because it does not adequately plead that (a) NMPA's conduct constituted the wrongful means necessary for a claim of tortious interference, or (b) it would have entered into synchronization licenses with music publishers "but for" NMPA's conduct. (*See* Opening Br., at 17–24.) Peloton has not alleged that NMPA acted "for the sole purpose of

---

[4]  Peloton requests that it be granted leave to amend its product market definition. There is no basis to do so because Peloton has not identified "how amendment would cure the pleading deficiencies." *See Attestor Value Master Fund* v. *Republic of Argentina*, 940 F.3d 825, 833 (2d Cir. 2019) (internal citations and quotations omitted).

7

inflicting intentional harm" on Peloton. Peloton can point to no facts from which to draw an inference that NMPA engaged in "anticompetitive collusion" and violated the Sherman Act. (*See* Opening Br., at 7–17); *supra* Argument, Section I. As such, Peloton's deficient antitrust claims cannot constitute the necessary "wrongful means."[5]

Peloton's allegation that NMPA made "misrepresentations (about Peloton and its prior negotiations with NMPA) to individual publishers with whom Peloton was negotiating . . . with the purpose of disrupting Peloton's negotiations with such publishers" (New Countercl. ¶ 117), is not enough to state a claim for tortious interference. "[N]ot just *any* misrepresentation is sufficient to state a claim" for tortious interference. *Sidney Frank Importing Co.* v. *Beam Inc.*, 998 F. Supp. 2d 193, 212 (S.D.N.Y. 2014) (citing *Friedman* v. *Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009)) (emphasis in original). Rather, a misrepresentation must resemble "more culpable" conduct.[6] *Friedman*, 321 F. App'x at 60 (citing *Carvel Corp.*, 3 N.Y.3d at 190 (holding that alleged misrepresentation did not suffice to establish wrongful means).

The authority Peloton relies on bolsters rather than contradicts this point. In *Clean Coal Techs., Inc.* v. *Leidos, Inc.*, misrepresentations made by the defendant "*in the service of personal gain*" were sufficient to state that the defendant "engaged in conduct for the sole purpose of inflicting intentional harm on" the plaintiff. 377 F. Supp. 3d 303, 323 (S.D.N.Y. 2019). Peloton

---

[5] There is no basis in the New Counterclaims for Peloton's assertion that NMPA's alleged violation of its nondisclosure agreement with Peloton "constitutes an actionable misappropriation of trade secrets under both New York common law and the Defense of Trade Secrets Act." (*See* Opp. at 21 n.2.) Peloton has not even attempted to plead that the information governed by the parties' NDA constituted a trade secret under either New York or federal law. Stating a valid claim for misappropriation of trade secrets requires "at minimum, that the plaintiff generally identify the trade secrets at issue." *Alexander Interactive, Inc.* v. *Leisure Pro Ltd.*, No. 14–CV–2796, 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014); *see also Sorias* v. *Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 258 (E.D.N.Y. 2015) ("Conclusory assertions that something constitutes a trade secret[] . . . are insufficient.").

[6] To be "more culpable," "as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004).

has not alleged that NMPA made misrepresentations to the Publishers "in service of" its "personal gain" or that *any* supposed misrepresentations rise to "more culpable" conduct. *See id.*; *Friedman*, 321 F. App'x at 60.  Nor can it, because, as Peloton pleads, NMPA's conduct at all times was "in service of" its member music publishers:  NMPA engaged in collective negotiations on behalf of music publishers with the intent to "obtain compensation for all past, present, and future uses of musical works" and insisted "on compensation for all its member publishers that had not previously entered into agreements with Peloton." (New Countercl. ¶¶ 33, 35.)  For the same reason, NMPA's conduct cannot be found to be "malicious."  Nor can any alleged effort by NMPA "to stifle Peloton's relations with" the Harry Fox Agency ("HFA") (Opp. at 23 (citing New Countercl. ¶¶ 72–78)) constitute the "wrongful means" or "malicious" conduct necessary to uphold a claim for tortious interference by the NMPA.  The New Counterclaims seek to hold NMPA responsible for interference with Peloton's prospective business relations *with the Publishers*, not with HFA.  In its impermissibly amended Counterclaims,[7] Peloton alleges that NMPA's conduct in connection with HFA "further illustrate[s]" the trade association's "explicit and malicious intent to harm Peloton" (New Countercl. ¶¶ 113–21), but fails to plead how that conduct interfered with any prospective relations with any Publisher or otherwise rises to the requisite level of culpability.[8]

*Second*, Peloton has not plausibly alleged that it would have entered into synchronization licenses with music publishers "but for" NMPA's conduct.  Even for the

---

[7] Peloton's argument that Fed. R. Civ. P. 15 permitted it to file amended counterclaims without permission has been roundly rejected.  *See, e.g.*, *Ramsay-Nobles* v. *Keyser*, No. 16 Civ. 5778, 2018 WL 6985228, at *4–5 (S.D.N.Y. December 18, 2018) (rejecting the "permissive" approach to amended counterclaims and denying defendants' motion for leave to amend in response to plaintiffs' amended complaint).  Indeed, in the single case that Peloton cites to support its position, this Court ultimately exercised its discretion to *deny* the defendants' motion for leave to amend their counterclaims.  *River Light V, L.P.* v. *Lin & J Int'l, Inc.*, No. 13 Civ. 3669, 2014 WL 2861480, at *4 (S.D.N.Y. June 24, 2014).

[8] Peloton's assertion that HFA's President and CEO "presciently warned Peloton that 'many more compositions and plaintiffs' would be coming into this lawsuit" on or about June 4, 2019 (Opp. at 6) is of no moment:  Plaintiffs and Counterclaim Defendants' counsel made the very same representation in open court at the pre-trial conference held on May 9, 2019 in this action.

9

Publishers with which Peloton allegedly engaged in negotiations, Peloton fails to make any non-conclusory assertions that those negotiations would have coalesced into deals but for NMPA's conduct; for the majority of Publishers, Peloton has not even alleged *any* such negotiations. Though Peloton attempts to argue that a claim for tortious interference can extend to "mere negotiations," it is settled law that "the requirements for establishing liability for interference with prospective contractual relations are 'more demanding' than those for interference with performance of an existing contract." *Union Carbide Corp.* v. *Montell N.V.*, 944 F. Supp. 1119, 1142 (S.D.N.Y. 1996). Peloton fails to meet these "more demanding" requirements. (Opening Br., at 23–24); *see also Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 405 (S.D.N.Y. 2019).

Moreover, despite Peloton's assertions to the contrary, "'but for' causation," which "has been endorsed by the New York Court of Appeals," "appear[s] to be the dominant standard"—not "reasonable expectation." *Guzik* v. *Albright*, No. 16-CV-2257, 2018 WL 4386084, at *7 (S.D.N.Y. Sept. 14, 2018). Peloton's assertion that it had a "reasonable expectancy of entering into" licenses with publishers (Opp. at 23) does not constitute "but for" causation, the "dominant standard."

## CONCLUSION

For these reasons and those set forth in Counterclaim Defendants' opening brief, Counterclaim Defendants respectfully request that the Court dismiss the Counterclaims in their entirety and with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

Dated: New York, New York
November 15, 2019

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:    /s/ Jay Cohen
       Jay Cohen
       Darren W. Johnson
       Elana R. Beale

1285 Avenue of the Americas
New York, New York 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
jaycohen@paulweiss.com
djohnson@paulweiss.com
ebeale@paulweiss.com

*Attorneys for Counterclaim Defendants*

11