UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
DOWNTOWN MUSIC PUBLISHING LLC, OLE MEDIA      :
MANAGEMENT, L.P., BIG DEAL MUSIC, LLC,        :
CYPMP, LLC, PEER INTERNATIONAL CORPORATION,   :
PSO LIMITED, PEERMUSIC LTD., PEERMUSIC III,   :
LTD., PEERTUNES, LTD., SONGS OF PEER LTD.,    :        19cv2426(DLC)
RESERVOIR MEDIA MANAGEMENT, INC., THE         :
RICHMOND ORGANIZATION, INC., ROUND HILL       :        OPINION AND ORDER
MUSIC LLC, THE ROYALTY NETWORK, INC. ULTRA    :
INTERNATIONAL MUSIC PUBLISHING, LLC, TUNE     :
CORE, INC., RALEIGH MUSIC PUBLISHING LLC,     :
ME GUSTA MUSIC, LLC, STB MUSIC, INC., and     :
GREENSLEEVES PUBLISHING LIMITED,              :
                                              :
                        Plaintiffs,           :
                                              :
            -v-                               :
                                              :
PELOTON INTERACTIVE, INC.,                     :
                                              :
                        Defendant.            :
                                              :
-------------------------------------------X
PELOTON INTERACTIVE, INC.,                     :
                                              :
                        Counterclaimant,      :
                                              :
            -v-                               :
                                              :
NATIONAL MUSIC PUBLISHERS ASSOCIATION,        :
INC., BIG DEAL MUSIC, LLC, CYPMP, LLC,        :
DOWNTOWN MUSIC PUBLISHING LLC, PSO LIMITED,   :
PEER INTERNATIONAL CORP., PEERMUSIC III,      :
LTD., PEERMUSIC, LTD., PEERTUNES, LTD.,       :
RESERVOIR MEDIA MANAGEMENT, INC., ROUND       :
HILL MUSIC LLC, SONGS OF PEER, LTD., THE      :
RICHMOND ORGANIZATION, INC., THE ROYALTY      :
NETWORK INC., ULTRA INTERNATIONAL MUSIC       :
PUBILSHING, LLC, and OLE MEDIA MANAGEMENT,    :
L.P.,                                         :
                                              :
                        Counter-defendants.   :
                                              :
-------------------------------------------X

APPEARANCES

For plaintiffs:
Jay Cohen
Darren W. Johnson
Elana R. Beale
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3163

For defendant:
Kenneth L. Steinthal
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
(415) 318-1200

J. Blake Cunningham
King & Spalding LLP
500 West 2nd St., Ste. 1800
Austin, TX 78701
(512) 457-2000

Christopher C. Yook
David P. Mattern
King & Spalding LLP
1700 Pennsylvania Ave., Ste. 200
Washington, DC 20006

Emily T. Chen
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100

DENISE COTE, District Judge:

Fifteen music publishers (the "Music Publishers")[1] have sued

Peloton Interactive, Inc. ("Peloton") for copyright

---

[1] Downtown Music Publishing LLC ("Downtown"), ole Media
Management, L.P. ("ole"), Big Deal Music, LLC, CYPMP LLC d/b/a
Pulse Music Group, Peer International Corporation, PSO Limited,
Peermusic Ltd., Peermusic III, Ltd., Peertunes, Ltd., Songs Of

infringement.  This Opinion addresses the motion to dismiss
Peloton's counterclaim against the Music Publishers and the
National Music Publishers' Association, Inc. ("NMPA") for
violation of the Sherman Antitrust Act ("the Sherman Act"), 15
U.S.C. § 1.  This Opinion also addresses Peloton's counterclaim
against NMPA for tortious interference in business relations in
violation of New York law.  For the following reasons, the
motion to dismiss the counterclaims is granted.

## Background

The following facts are taken as alleged in the
counterclaims.  NMPA is the largest trade association of music
publishers in the United States.  Each of the Music Publishers
is a member of NMPA.

Peloton was formed in 2012 as an at-home fitness equipment
and content company.  The first product that Peloton brought to
market was the Peloton Bike, a stationary bike with a built-in
screen that displays live and on-demand workout classes.
Peloton also operates an indoor cycling studio in New York City,
where members of Peloton can participate in instructor-led group
cycling classes.  These classes are available on live-stream or
through an archived, on-demand library to home riders of the

---

Peer Ltd., Reservoir Media Management, Inc. ("Reservoir"), the
Richmond Organization, Inc., Round Hill Music LLC, the Royalty
Network, Inc. and Ultra International Music Publishing, LLC
(collectively the "Music Publishers")

Peloton Bike.  Peloton has recently launched new products that apply the same concept to other forms of exercise.

The instructor-led classes made available by Peloton contain music.  According to Peloton, instructors choose which music to play during their classes and curate "playlists of songs that are suitable for the feel and tempo desired by the instructor."  Peloton alleges that instructors plan "only days, or sometimes hours, in advance" the music they wish to incorporate into their classes.

I.   Sync Licensing

Because instructors provide Peloton with limited notice of the music that they intend to play in class, Peloton alleges that it is "ill-suited" to the "traditional" method by which music publishers license rights to third parties for use in derivative works with audio and visual components.  Peloton explains that these licenses, known as synchronization or "sync" licenses, "traditional[ly]" are issued for use in television shows and feature films "on an individual composition basis, one by one, and well in advance of exhibition of the content."  Rather than obtain sync licenses in this manner, Peloton explains, it has acquired from certain music publishers "catalog-wide" sync licenses, which cover all or substantially

all of a licensor's repertoire.[2]  Peloton has reached licensing agreements with all of the "major" music publishers and many independent music publishers.  Some of the music publishers with whom Peloton entered licensing agreements are members of NMPA.

## II.   Negotiations with NMPA

On April 9, 2018, Peloton received a letter from NMPA accusing Peloton of infringing uses of works owned, at least in part, by unnamed NMPA members with whom Peloton had not entered licensing agreements.  The letter stated that NMPA would negotiate on behalf of its members to obtain "compensation for all past, present, and future uses of musical works."

Following receipt of NMPA's letter, Peloton began discussing with NMPA possible terms for Peloton to license, on a going-forward basis, the use of compositions controlled by NMPA members that had not yet entered into licensing agreements with Peloton.  As alleged by Peloton, they also discussed possible compensation for prior uses of such publishers' works.  NMPA "insist[ed]" in the discussion that Peloton enter licensing agreements with all of NMPA's member music publishers.  Peloton explained that it "did not need licenses to all or even most music to provide a compelling experience for Peloton users; and

---

[2] Peloton alleges that it also obtained "comprehensive licensing of the public performance rights associated with the compositions embodied in those sounds recordings from the relevant performing rights organizations."

it was therefore unreasonable and uneconomical for Peloton to pay publishers whose works would never be used on Peloton's platform."

On several occasions, Peloton asked NMPA for a list of its members so that Peloton could negotiate with them separately. NMPA declined to provide the list.  Peloton alleges that NMPA "demanded" that Peloton deal exclusively through NMPA, except for those members with whom Peloton already had licensing agreements.

III.  Direct Outreach to Music Publishers

By January 2019, NMPA had become "increasingly non-responsive" in discussions with Peloton.  At this point, Peloton reached out directly to several Music Publishers whose works Peloton wanted to license.  It describes in some detail its discussions with three of them.  After initial discussions, the Music Publishers stopped responding to Peloton's outreach. According to Peloton, NMPA "conveyed information to and coordinated with" these Music Publishers during Peloton's futile attempts to negotiate individual licenses.

IV.  The Harry Fox Agency

In January 2019, Peloton began formal discussions for data services with the Henry Fox Agency ("HFA"), a rights-management agency that provides music publishing licensing and rights administration services.  HFA was founded by NMPA and was under

its ownership until October 2015, when it was acquired by SESAC, a performing rights organization.  On February 1, 2019, HFA amended the terms of a non-disclosure agreement it signed with Peloton and entered into an Administration Services Agreement to assist Peloton with identifying musical works and their associated licenses.  Under the terms of the agreement, HFA would identify sound recordings that HFA believed to be licensed 100% under Peloton's direct licensing agreements with publishers.

HFA continued providing services to Peloton through early May 2019.  On May 16, Peloton sent HFA an email containing terms for additional services.  On June 4, HFA explained that it would no longer engage with Peloton because it was under "a ton of pressure, not just from D.C. but also from New York."  According to Peloton, the data HFA had provided to Peloton in February and May 2019 was "faulty" and "inaccurate."

V.   Procedural History

On March 29, 2019, the Music Publishers commenced this action against Peloton, alleging that Peloton has willfully infringed their copyrights in musical works they own and control.  Although not a plaintiff, NMPA issued a press release publicizing the lawsuit on the day of its filing.

On April 30, Peloton answered and filed counterclaims against the Music Publishers and NMPA (collectively, the

"Counter-Defendants").  The counterclaims assert that, in violation of Section 1 of the Sherman Act, NMPA sought to extract supracompetitive license terms from Peloton by negotiating collectively on behalf of its member publishers, and that, as a result, the Music Publishers collectively refused to deal with Peloton.  The counterclaims also assert that NMPA committed tortious interference in prospective business relations in violation of New York law by disrupting Peloton's negotiations with individual Music Publishers.

Following a conference on May 9, a scheduling order set May 31, 2019 as the deadline for the amendment of pleadings.  On May 31, the Music Publishers filed a first amended complaint.  On June 14, Peloton answered the first amended complaint, repleading its counterclaims.  The Counter-Defendants moved to dismiss Peloton's counterclaims on June 24.

On September 12, the Music Publishers requested leave to amend their complaint to join additional music publishers as plaintiffs and to add musical compositions to the list of infringed works.  The Music Publishers explained that they had become aware of these works in the course of discovery.  On September 27, the Music Publishers' request was granted and they filed a second amended complaint.  On October 11, Peloton filed an answer to the second amended complaint and amended its

counterclaims.[3]  On October 25, the Counter-Defendants renewed
their motion to dismiss Peloton's counterclaims.  This motion
became fully submitted on November 15.

As extended through an Order of October 3, fact discovery
is set to conclude on March 6, and expert discovery to conclude
on June 12.  Any summary judgment motion is due July 13, 2020.

## Discussion

"A motion to dismiss counterclaims under Rule 12(b)(6) is
decided under the same standard applied to a motion to dismiss
the claims of a complaint."  Dress Barn, Inc. v. Klauber Bros.,
Inc., No. 18cv8085(DLC), 2019 WL 1949675, at *2 (S.D.N.Y. Apr.
22, 2019).  "To survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face."  Geffner v.
Coca-Cola Co., 928 F.3d 198, 199 (2d Cir. 2019) (citation
omitted).  "A claim has facial plausibility when the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged."  Charles v. Orange County, 925 F.3d 73, 81
(2d Cir. 2019) (citation omitted).  "Threadbare recitals of the
elements of a cause of action, supported by mere conclusory
statements, do not suffice."  Empire Merchants, LLC v. Reliable

---

[3] The amended counterclaims added Peloton's allegations regarding
the Henry Fox Agency.

Churchill LLP, 902 F.3d 132, 139 (2d Cir. 2018).  The plaintiff must plead enough facts to "nudge[ ] [his] claims across the line from conceivable to plausible . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[ ] all factual allegations as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Coal. for Competitive Elec., Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted).  "A complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted).

I.  Antitrust Claim

The Counter-Defendants argue that Peloton's Sherman Act claim is barred by the Noerr-Pennington doctrine, and in any event, fails to state claim.  These arguments are addressed in turn.

A. Noerr-Pennington Doctrine

"Generally, under the Noerr-Pennington doctrine, citizen petitions are immune from antitrust liability in light of the

First Amendment." In re DDAVP Direct Purchaser Antitrust Lit.,
585 F.3d 677, 685-86 (2d Cir. 2009). "[G]ood faith litigation
to protect a valid copyright . . . falls within the protection
of the Noerr-Pennington doctrine." Primetime 24 Joint Venture
v. Nat'l Broad., Co., 219 F.3d 92, 100 (2d Cir. 2000). Noerr-
Pennington also protects "prelitigation" efforts, including
threat letters, settlement offers, and the rejection of
settlement offers. Primetime, 219 F.3d at 100, 102. Thus,
under Noerr-Pennington, a collective rejection of a settlement
offer is not susceptible to an antitrust claim alleging a
concerted refusal to deal. See Primetime, 219 F.3d at 102.

In the context of antitrust actions brought against
claimants alleging copyright infringement, however, the Second
Circuit has clarified that while "coordinated efforts to enforce
copyrights against a common infringer may be permissible,
copyright holders may not agree to limit their individual
freedom of action in licensing future rights to sue an infringer
before, during, or after" a lawsuit. Id. at 102-03. In making
this distinction, courts consider whether the party initiating
negotiations attempted to "deal individually" with copyright
holders. Id. at 102.

The Noerr-Pennington doctrine does not protect the Music
Publishers' alleged concerted refusal to license copyrighted
works to Peloton. Relying on NMPA's April 9, 2019 letter to

Peloton in which it informed Peloton that it would be willing to negotiate on behalf of its members for all "future uses by Peloton of works that are presently unlicensed," and Peloton's futile efforts to separately negotiate individual licenses with certain NMPA members, Peloton has alleged that NMPA and the Music Publishers have agreed to unlawfully limit the individual freedom of action of the Music Publishers.

The Counter-Defendants' arguments to the contrary are not persuasive.  First, they contend that the Noerr-Pennington doctrine protects their pre-litigation conduct from antitrust liability unless Peloton can prove that the Music Publishers' copyright-infringement action against Peloton was "baseless." It is true that a "baseless" lawsuit is not protected by the Noerr-Pennington doctrine.  In re DDAVP Direct Purchaser Antitrust Lit., 585 F.3d at 686.  But, the legitimacy of the Music Publishers' copyright-infringement action against Peloton would not permit the Music Publishers to band together and deny Peloton the right to individually negotiate future sync licenses with either some or all of them.

The Counter-Defendants also argue that Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc. ("PREI"), 944 F.2d 1525 (9th Cit. 1991), teaches that their conduct is protected by the Noerr-Pennington doctrine.  They are wrong.  In PREI, the Ninth Circuit held that, "[o]n the facts of

12

this case," a request to obtain licenses amounted to a settlement offer where the offer was made after the initiation of the copyright infringement action.  Id. at 1528.  Peloton's allegations cannot be so cabined.[4]

  B. Section 1 of the Sherman Act

  Next, the Counter-Defendants argue that Peloton's Sherman Act claim should be dismissed for two separate reasons.  They argue that Peloton has failed to sufficiently plead facts supporting the existence of a conspiracy and also that Peloton has failed to identify a relevant product market.  They are correct that Peloton's antitrust claims must be dismissed for failure to identify a relevant market.

  1. Conspiracy

  Section 1 of the Sherman Act prohibits restraints on trade effected by a contract, combination, or conspiracy.  US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 54 (2d Cir. 2019).  The "crucial question" in a Section 1 case therefore is whether "the challenged conduct stems from independent decision or from

---

[4] The remaining cases cited by the Counter-Defendants are non-binding on this Court and, in any event, do not hold that pre-litigation collective action to obstruct individual licensing activity is protected by the Noerr-Pennington doctrine.  See Sosa v. DIRECTV, Inc., 437 F.3d 923, 935 (9th Cir. 2006); Maverick Recording Co. v. Chowdhury, No. 7cv200, 7cv640 (DGT), 2008 WL 3884350 at *3 (E.D.N.Y. Aug. 19, 2008).

an agreement, tacit or express." United States v. Apple, 791
F.3d 290, 314-15 (2d Cir. 2015) (citation omitted).

At the pleading stage, a plaintiff must allege enough facts
to support the inference that a conspiracy existed. Mayor and
City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129,
136 (2d Cir. 2013). "While for purposes of a summary judgment
motion, a Section 1 plaintiff must offer evidence that tends to
rule out the possibility that the defendants were acting
independently, to survive a motion to dismiss, . . . a plaintiff
need only allege enough factual matter (taken as true) to
suggest that an agreement was made." Starr v. Sony BMG Music
Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (citation omitted).

To prove the existence of a conspiracy, parallel action is
not, by itself, sufficient. Apple, 791 F.3d at 315. But, "the
existence of additional circumstances, often referred to as
'plus' factors . . . when viewed in conjunction with the
parallel acts, can serve to allow a fact-finder to infer a
conspiracy." Id. (citation omitted). These additional
circumstances can consist of "direct evidence that the
defendants entered into an agreement," or "circumstantial facts
supporting the inference that a conspiracy existed." Id.
(citation omitted). "Circumstances that may raise an inference
of conspiracy include a common motive to conspire, evidence that
shows that the parallel acts were against the apparent

14

individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Id. (citation omitted).

Peloton has plausibly alleged that the Counter-Defendants conspired to deny Peloton licenses to their copyrighted works. Peloton alleges that from April 2018 to January 2019 it negotiated with NMPA regarding the compensation of the Music Publishers.  According to Peloton, NMPA demanded Peloton deal exclusively with NMPA and repeatedly declined to give Peloton a list of NMPA members, impeding Peloton in its effort to independently negotiate licenses.  In January and February 2019, when Peloton finally attempted bilateral discussions with several Music Publishers, including ole, Reservoir, and Downtown, those Music Publishers cut off the discussions simultaneously and abruptly.  One month later, on March 29, 2019, the Music Publishers initiated this litigation against Peloton.  That same day, NMPA's President and CEO appeared on a news segment as "the man behind the Peloton lawsuit."

This evidence suggests that the Music Publishers' decisions to stop discussions with Peloton regarding future licensing agreements were not the result of "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Apple, 791 F.3d at 315 (citation omitted).  Rather, this evidence supports the

inference that the Music Publishers decided together that they would refuse to negotiate with Peloton.

In arguing to the contrary, the Counter-Defendants contend that the Music Publishers' copyright infringement lawsuit against Peloton was an "obvious reason" to discontinue further negotiations with Peloton.  They also argue that their parallel decisions to discontinue negotiations with Peloton is innocently explained by Peloton's own allegation that NMPA misled the Music Publishers about the status of NMPA's negotiations with Peloton.  But, at the pleading stage, Peloton is not required to offer evidence that tends to rule out the possibility that each of the Music Publishers was acting independently.  It need only allege enough factual matter to suggest that an agreement was made.  It has succeeded in doing so.

### 2. Relevant Market

The Counter-Defendants next argue that Peloton has failed adequately to allege a relevant product market.  To state a Section 1 claim, Peloton must identify a relevant market in which the anticompetitive effects of the challenged restraint are to be measured or, if a _per se_ violation is alleged, may be presumed.[5]  _Sabre_, 938 F.3d at 55.  "The relevant market is

---

[5] Peloton argues that there is no need to address the relevant market given the "per se" nature of the Counter-Defendants' violation of Section 1.  But, "it is an element of a _per se_ case to describe the relevant market in which [courts] may presume

broadly defined as the area of effective competition, which is typically the arena within which significant substitution in consumption or production occurs." Id.  The relevant market "is determined by the choices available to" consumers of the product.  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481-82 (1992).  "Products will be considered to be reasonably interchangeable if consumers treat them as acceptable substitutes." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted).

"Market definition is ordinarily a deeply fact-intensive inquiry." Sabre, 938 F.3d at 55 (citation omitted). Accordingly, courts often "hesitate to grant motions to dismiss for failure to plead a relevant market." Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001).  "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Id. at 200; see also Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 53 (2d Cir. 2016).

The Second Circuit has explained that

the anticompetitive effect would occur." Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999); cf. Texaco Inc. v. Dagher, 547 U.S. 1, 5-6 (2006) (explaining that companies did not compete in the same relevant market, so per se analysis was not required); Apple, 791 F.3d at 330 (recognizing that one considers conduct within the relevant market to determine whether the rule of reason or per se analysis applies).  Thus, regardless of which standard applies, Peloton must articulate a relevant market.

> where the plaintiff fails to define its proposed
> relevant market with reference to the rule of
> reasonable interchangeability and cross-elasticity of
> demand, or alleges a proposed relevant market that
> clearly does not encompass all interchangeable
> substitute products even when all factual inferences
> are granted in plaintiff's favor, the relevant market
> is legally insufficient and a motion to dismiss may be
> granted.

Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir.
2008) (citation omitted).

Peloton defines the relevant market as sync "licenses to
the copyrighted works controlled (in whole or in part) and
collectively negotiated by the [Music] Publishers through NMPA."
This proposed market is legally insufficient.  In the words of
Chapman, this proposed market "clearly does not encompass all
interchangeable substitute products."  546 F.3d at 238 (citation
omitted).  Peloton does not explain why it cannot substitute
songs with sync licenses owned by the Music Publishers for songs
with sync licenses owned by other publishers.  Indeed, as
Peloton admits, it has successfully "collaborated with music
publishers to develop an innovative [sync] licensing framework
that is appropriate for its business and reached agreements with
all the 'major' music publishers and many independent music
publishers."

Peloton argues that sync licenses are not interchangeable
because every song has "nonfungible qualities."  It is true that
every copyrighted work has at least some modicum of originality.

18

But, recognition of that fundamental tenet of copyright law does not explain why songs not controlled by the Music Publishers cannot substitute in exercise programming for songs they do control.

Peloton also contends that its proposed relevant market is "consistent" with how "other courts" have defined markets involving "music rights" in antitrust suits.  The sole case on which Peloton relies to so argue is <u>Meredith Corp. v. SESAC, LLC</u>, No. 09cv9177 (NRB), 2011 WL 856266, at *9 (S.D.N.Y. 2011). But, in <u>Meredith</u>, the district court credited the plaintiffs' allegation that, as a matter of "entrenched industry practice," music was "irrevocably embedded" in programming acquired by television networks, and thus the plaintiff networks could not avoid music with rights belonging to the defendant performing-rights organization.  <u>Id.</u> at *7-8 & 8 n.10.  Peloton has made no such allegation with respect to sync licensing used in fitness videos.  Indeed, as just noted, Peloton has already obtained licenses from all the "major" and "many independent" music publishers.

## II.  Tortious Interference

Peloton also alleges that NMPA has committed tortious interference with prospective business relations in violation of New York law by disrupting Peloton's licensing negotiations with individual Music Publishers.  To state a claim for tortious

interference with prospective business relations under New York law, four conditions must be met: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations with a third party; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., LLC v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008). Tortious interference with business relations also "requires an allegation that plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct."[6] Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 107 (2d Cir. 2009) (per curiam) (citation omitted).

NMPA argues that Peloton's tortious interference claim fails because Peloton has insufficiently alleged that it would have entered into sync licenses with the Music Publishers but for NMPA's conduct.[7] NMPA is correct. Although Peloton has

---

[6] Peloton argues that the current standard for a tortious interference claim requires that a plaintiff allege only a "reasonable expectancy" of a contract with a third party, rather than but for causation. In so arguing, Peloton cites Davidcraft Corp. v. Danu Int'l, Inc., No. 90cv6578 (CMM), 1992 WL 162997, at *4 (S.D.N.Y. June 24, 1992). The New York Appellate Division has confirmed that New York law requires plaintiffs to allege but for causation. See, e.g., Shawe v. Kramer Levin Naftalkis & Frankel LLP, 91 N.Y.S. 3d 369, 373 (App. Div. 1st Dep't 2018).

[7] NMPA also contends that Peloton has insufficiently pleaded that NMPA pursued wrongful means or had a wrongful purpose. It is

alleged that it sent "term sheets," "other offer materials," and a non-disclosure agreement to certain Music Publishers, and "provided data and proposed license terms" to another before NMPA's alleged interference, Peloton has not alleged that any of these Music Publishers reciprocated Peloton's interest in continuing, much less finalizing, these agreements.

## III.   Leave to Amend

Peloton requests that, if its alleged relevant market is found legally deficient, it should be granted leave to amend in order to define the relevant market as all members of NMPA that have not licensed their rights to Peloton.  Rule 16, Fed. R. Civ. P., governs the amendment of pleadings after a scheduling order has been issued.  It states, "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b).  "[A] district court . . . does not abuse its discretion in denying leave to amend the pleadings where the moving party has failed to establish good cause, as required by Rule 16(b), to amend the pleadings after the deadline set in the scheduling order."  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 243 (2d Cir. 2007).  "Whether good cause exists turns on the diligence of the moving party."  BPP Illinois, LLC v.

---

not necessary to address whether Peloton has adequately pleaded wrongful means or wrongful purpose because Peloton has not sufficiently alleged but-for causation.

Royal Bank of Scotland Grp., 859 F.3d 188, 195 (2d Cir. 2017)
(citation omitted).

When a plaintiff "fails to specify . . . how amendment
would cure the pleading deficiencies in the complaint," it "need
not be given leave to amend."  Attestor Value Master Fund v.
Republic of Argentina, 940 F.3d 825, 833 (2d Cir. 2019)
(citation omitted).  A court may even "deny leave to amend
implicitly by not addressing the request when leave is requested
informally in a brief filed in opposition to a motion to
dismiss."  Porat v. Lincoln Towers Cmty. Ass'n, 464 F.3d 274,
276 (2d Cir. 2006) (citation omitted).

Peloton's request to further amend its counterclaims is
denied.  Peloton did not make a formal request by submitting the
proposed amendment to its counterclaims.  Instead, it requested
leave informally in three sentences in its opposition brief to
the Counter-Defendants' motion to dismiss.  Peloton did not
explain why its alternative definition of a relevant product
market would cure the deficiencies that it anticipated this
Court would find with respect to the interchangeability of music
suitable for fitness videos.  Rather, it left to speculation the
quantity and diversity, or lack thereof, of music controlled by
NMPA members from whom Peloton does not have licenses.  It also
did not explain how this set of compositions compares to the
music controlled by all the "major" and "many independent" music

publishers from whom Peloton already has obtained licenses.  In
sum, Peloton did not provide any basis to conclude that the
issue of interchangeability would be solved by changing the
relevant product market from sync licenses held by the Music
Publishers to sync licenses held by all NMPA members and not
licensed to Peloton.  Peloton has not shown, therefore, that its
proposed amendment would be anything other than futile.

Peloton also has failed to demonstrate the diligence
necessary for a finding of good cause.  Since the start of this
litigation, Peloton has had ample opportunity to amend its
counterclaims to redefine the relevant product market.  It has
declined to do so.  This action was filed on March 19, 2019.
Peloton answered and filed counterclaims on April 30.  As it has
throughout this lawsuit, Peloton proposed that, for purposes of
its antitrust counterclaim, the relevant product market be
defined as sync "licenses to the copyrighted works controlled
(in whole or in part) and collectively negotiated by the [Music]
Publishers through NMPA."

A scheduling order of May 9 set May 31, 2019 as the date by
which amended pleadings had to be filed.  On that date, the
Music Publishers filed their first amended complaint, and
Peloton answered on June 14, repleading its counterclaims.  On
June 24, the Counter-Defendants moved to dismiss the
counterclaims arguing that, among other things, Peloton's

definition of the relevant market required dismissal of its antitrust counterclaim.

On September 27, the Music Publishers were granted leave to file a second amended complaint ("SAC") in light of information that they became aware of through discovery.  On October 11, Peloton filed amended counterclaims with its answer to the SAC.[8] Despite knowledge that its definition of the relevant market was subject to a motion to dismiss, Peloton did not revise the definition of the relevant market.  With the amendment of the counterclaims, the June 24 motion to dismiss became moot, and the Counter-Defendants filed a renewed motion to dismiss again seeking dismissal of Peloton's antitrust claim based on its failure to plead a legally cognizable relevant market.

Throughout this time, discovery has been ongoing.  Fact discovery is set to close on March 6, 2020.  Allowing Peloton to amend its counterclaim at this late stage of the litigation would, at a minimum, require additional discovery regarding the entire universe of musical compositions controlled by NMPA's membership, as well as their licensing patterns and practices. The need to obtain such additional discovery would delay proceedings and require substantial additional expense.

---

[8] Authority is divided in this Circuit as to whether the filing of an amended complaint entitles a defendant to amend its counterclaims other than to respond to new issues raised in the amended complaint.

## Conclusion

The Counter-Defendants' October 25, 2019 motion to dismiss

Peloton's counterclaims is granted.

Dated:    New York, New York
          January 29, 2019

                            _____
                                  DENISE COTE
                       United States District Judge